**In the Matter of Bruce GRANOVETTER, Debtor,**

**LOWELL HOLDING CORP., Plaintiff,**

v.

**Bruce GRANOVETTER, Defendant.**

**Bankruptcy No. 182–11001.**

**Adv. No. 182–0355.**

United States Bankruptcy Court, E.D. New York.

April 29, 1983.

Saul I. Radin, New York City, for plaintiff.

Sudler & Barth, New York City, for debtor-defendant; Patrick H. Barth, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is an adversary proceeding brought pursuant to Rule 701(7) of the Rules of Bankruptcy Procedure ("the Rules") in which the plaintiff, Lowell Holding Corp. ("Lowell"), seeks to have a debt incurred by the defendant, Dr. Bruce Granovetter ("Dr. Granovetter or the Debtor"), declared non-

dischargeable pursuant to Section 523(a)(2)(B) of the Bankruptcy Reform Act of 1978 ("the Code"), 11 U.S.C. § 523(a)(2)(B).

These are the facts which were adduced at the trial which took place on part of two days.

Dr. Granovetter is a physician who filed a petition for relief pursuant to Chapter 7 of the Code, 11 U.S.C. § 701, *et seq.,* on April 19, 1982. Lowell, the owner of an apartment house at 9 Barrow Street in the Borough of Manhattan, claims that the debtor is indebted to it for damages arising from the breach of a lease for two apartments in that building. Although the complaint is inartfully drawn, a reading of it would lead one to believe that the relief sought by the plaintiff is the complete denial of the debtor's discharge pursuant to section 727, 11 U.S.C. § 727, *see* "Objections to Discharge" filed January 23, 1982, it was agreed at the trial that the relief sought by the plaintiff is to declare its debt non-dischargeable. (Tr., 10/1/82, p. 15, *ll.* 13–25)

The alleged debt arose as follows:

In November or December, 1981, the debtor began negotiations with a representative of J.I. Sopher & Co., Inc. ("Sopher") who was the renting agent for the building at 9 Barrow Street in the Greenwich Village section of Manhattan. He evinced an interest in leasing two penthouse apartments numbered 8E and 8F in the building and combining them into one unit. On December 19, 1981, he signed an "APARTMENT LEASE APPLICATION" for the apartments. The application, Plaintiff's Exhibit 1, was on a form used by Lowell's agent, Sopher. Although an employee of Sopher, Ms. Guarino, filled it out, the debtor concedes that he gave her the information contained therein. (Tr., 10/12/82, p. 15, *ll.* 22–25—p. 16, *l.* 2, p. 57, *ll.* 4–10)

In addition to giving her his name, address and other general information not relevant here, Dr. Granovetter supplied the following:

"Occupation .... Doctor .... Salary $150,000 +
Name of Company .... Self

Address .... 899 Lexington Ave. 10021
Length of Employment .... 1 yr.

\*     \*     \*     \*     \*     \*

Occupation .... Real Estate Dev ....
Salary $60,000 +
Name of Company .... Avatar Inc.
Address .... POB 729 Key West
Length of Employment .... 6 yrs.
Dep't Head .... Self Pres."

The question asking for additional sources of income was left blank, but questions asking for references, his charge accounts, and bank accounts were filled in. He represented that he had one bank account, a special checking account. Spaces for savings accounts were left blank. Next to the name of the bank in which he stated he had the checking account the figure "2500" is written above a space labeled "state Branch #." This figure purportedly represented his average bank balance. Aside from the questions already mentioned, asking about his financial affairs, there were no questions asking what debts, if any, he had, nor were there questions about any other unusual fixed expenses. In the space for "number of persons to occupy apartment," he listed only himself and his age at 33.

Even though the second "Occupation" blank is qualified with the phrase "(Other Working Member of Family)," there is no doubt that the debtor was representing that *his* second occupation was "Real Estate Dev.": the space for "spouse" on the application is not filled in and, indeed, he admitted on the witness stand that that "Real Estate Dev." was work he was claiming to be engaged in. (Tr., 10/12/82, p. 19)

Because Sopher's representative asked for verification of his income, Dr. Granovetter asked his tax preparer to send her a letter stating that his income would be approximately $150,000. (Tr., 10/12/82, p. 20) In this letter, dated December 14, 1981, H. Gerald Schiff, a certified public accountant who prepared the 1981 tax return for the debtor (Tr., 10/1/82, p. 41), wrote the following:

"I am the accountant for Bruce Granovetter and his 1982 income is expected to exceed $150,000." (Plaintiff's Exhibit 2)

With the exception of the request for this letter verifying Dr. Granovetter's income from his medical practice, no other attempt was made by Lowell or its agents to check the accuracy of the information supplied by him. (*see, e.g.* Tr., 10/1/82, p. 60) More particularly, Lowell did not even cause a simple credit check to be made. Had one been conducted, it might have revealed that Dr. Granovetter had been adjudicated a bankrupt and had obtained a discharge in bankruptcy in 1975. (Tr., 10/12/82, p. 43, *ll.* 16–18; Statement of Affairs attached to the petition for relief filed on April 19, 1982) Moreover, Daniel Zager ("Zager"), the president of Lowell who interviewed Dr. Granovetter in connection with the application, does not recall checking with his landlord to see if he paid his rent on a regular basis for the apartment in which he was living. (Tr., 10/1/82, p. 60, *ll.* 13–18) No attempt was made to call Avatar, Inc., the corporation of which the debtor identified himself as the president at a salary of "$60,000 +" a year. Zager explained:

"[H]e said there would be nobody there to talk with, because when he goes down there he was the one that handles things, so we just never did anything further on that."

(Tr., 10/1/82, p. 60, *ll.* 23–25)

Usually, Lowell conducts more extensive investigations. Zager testified:

"I generally make a personal investigation after the rental agent has presented the information on the application. I interview and then I decide how much further I wish to go in verification.

\*   \*   \*   \*   \*   \*

I will interview to begin with and then from that point on I might request permission to contact the various people who were referred to such as accountants or lawyers or business partner or people of that nature or a bank, bank executive so forth and I will either write to them and telephone them and in some instances, I

even hire a private investigator to get information, financial investigator.

\*   \*   \*   \*   \*   \*

If it's a large—In financial terms, if it's a large deal, I might do that. I've used D & B on occasion and others.

\*   \*   \*   \*   \*   \*

[A large deal is one that is] [l]arger than the usual for a particular building and building of this nature."

(Tr., 10/1/82, p. 55, *l.* 11—p. 56, *l.* 11)

In this case, however, Zager believed Dr. Granovetter figures because he was a physician. (Tr., 10/1/82, p. 57, *ll.* 19–22) Zager stressed that he had believed the statements to be true and that, had he known the true state of Dr. Granovetter's financial affairs, he would not have signed the lease. (Tr., 10/1/82, pp. 36–37)

Shortly after the letter verifying Dr. Granovetter's income was sent, negotiations for the apartments were broken off when, on December 20, 1981, the debtor sent a letter containing the following to Zager:

"Dear Mr. Zager:

After careful consideration of our telephone conversation of yesterday relating to the rental of penthouses 'E' and 'F' at 9 Barrow Street, I have decided not to proceed with negotiations on the apartments. Careful financial examination shows that the cost of accomplishing what I wish cannot be justified by the required investment."

This letter was sent on "Avatar" stationery. *See* Plaintiff's Exhibit 4.

Negotiations were resumed, however, in February of 1982 when Dr. Granovetter telephoned Zager to express renewed interest in the apartments. (Tr., 10/1/82, p. 59, *ll.* 15–19) At that time, according to Zager, the debtor assured Zager that his financial condition had not changed. (*Id.* at p. 59, *l.* 24—p. 60, *l.* 12)

On February 26, 1982, shortly after that telephone call, Zager and Dr. Granovetter met, at which time Lowell and the debtor signed a lease, prepared by Sopher, for the two apartments. (*Id.* at 28, 63) The lease is a Real Estate Board of New York, Inc.

Standard Form of Lease with lengthy riders, which provides for a rental of $4,533.33 per month for both apartments for a period of three years from March 1, 1982 through February 28, 1985.

The lease contains riders providing, among other things, for considerable alterations of the two apartments in order to join them together. Plaintiff's Exhibit 3, ¶ 43; ¶ 20(5).

At the end of the printed portion of the lease and before the riders, there are spaces for the signatures of the owner and the tenant, the parties thereto. The first space has typed therein the name "Lowell Holding Corp." below which is typed "By," followed by the handwritten signature "Daniel Zager, Pres." On the space below, at the place designated "Tenant's Signature," there appears the handwritten signature "Bruce Granovetter" or "Bruce Granovetter M.D.," below which is typed "Bruce Granovetter, M.D.P.C." The debtor's signature is not written clearly enough for me to be able to decipher whether or not there is an "M.D." after it. Zager testified that when the lease was signed he did not notice that Granovetter's typed name included the "P.C." (Tr., 10/1/82, p. 68, ll. 3–9) He further testified that it is always his policy to have corporate leases individually guaranteed. (Id. at 66, ll. 2–3) This lease, however, was not guaranteed despite the professional corporation designation.

Although the lease provides for one month's security and for the payment of the rent in advance, for a total of $9,066.66, ¶ 3, ¶ 5, Plaintiff's Exhibit 3, at the closing Dr. Granovetter gave Zager a check for only $8,533.33, $533.33 less than the agreed upon amount. This check was post-dated to April 1, 1982. Plaintiff's Exhibit 5. Zager testified that at the time of the closing he "made note" to the debtor that the check was not for the correct amount. He explained:

"I can't really remember except for the fact after he made it up I made note of it to him and he said, 'Well, I owe you a few hundred dollars and I'll give it to you later.' I just let it go. It was a small

amount for the time being and we were moving kind of fast. It was late in the day and we decided to close it and be finished with it and that's why and how it was done."
(Tr., 10/1/82, p. 71, ll. 2–11)

Zager did not, however, realize the check was post-dated. He testified that had he realized it was post-dated, he would not have signed the lease. (Tr., 10/1/82, p. 71, ll. 12–24; 10/12/82, p. 69, ll. 18–24)

The check was immediately deposited but was returned by Dr. Granovetter's bank on March 4, 1982 for insufficient funds. It has never been honored; when it was redeposited on April 4, 1982, it was returned because the debtor had stopped payment on it. Plaintiff's Exhibits 6, 7.

On March 5, 1982, about the time his check was dishonored, Dr. Granovetter wrote Zager the following letter:

"Dear Mr. Zager:
The sale of my property in Key West, which was a certainty, has completely fallen through at this time. Due to this circumstance, I will be unable financially to comply with the terms of our rental agreement for PHE & PHF at 9 Barrow Street. I sincerely apologize for the inconvenience this may cause and ask your forgiveness for any time of yours I may have wasted. I do sincerely wish that I could have continued with the matter, but circumstances dictate against it.
Although my checks were post dated to April 1, as we agreed, I would appreciate your simply destroying them.
Thank you and again, I am very sorry.
    Sincerely yours,
    Bruce Granovetter (signed)
    Bruce Granovetter, M.D. (typed)"

Zager testified that immediately after the debtor's check was dishonored the second time, Lowell began efforts to re-rent the apartments. One of the apartments, 8E, was eventually leased to Putnam Realty Company, a company in which Zager is a partner. Putnam Realty never occupied the premises and Zager does not recall how much rent Putnam was obligated to pay to

Lowell. (*Id.* at p. 80, *l.* 21—p. 85, *l.* 12) Putnam then sublet the apartment to Stanley and Theresa Wilcox for a two-year term to begin September 1, 1982 for $2,400 per month and Lowell rented apartment 8F for a one-year term beginning June 1, 1982 for $1,450 per month to someone else. (*Id.* at 38, *ll.* 4–25)

On March 24, 1982, Dr. Granovetter caused an action to be commenced in the New York State Supreme Court, County of New York, entitled Bruce Granovetter, M.D., P.C. against Lowell Holding Corp. to void the lease (*Id.* at p. 72, *ll.* 11–25) on the ground that the premises could not be altered in accordance with the plans. The plaintiff in that action was represented by a different firm of attorneys than those now representing the debtor. (Defendant's Exhibit A) This action has not been prosecuted since the filing of the petition for relief in this court.

Other facts adduced at trial make it clear that the financial information supplied by Dr. Granovetter on the application, Exhibit 1, was inaccurate. Dr. Granovetter's 1981 tax return, admitted into evidence as Plaintiff's Exhibit 10, shows an adjusted gross income for the 1981 tax year of minus $4,745. His wages, earned as an employee of Beth Israel Medical Center ($2,235) and of Sudler and Hennessey Inc. ($30,000) amount to $32,235. In addition, according to Schedule C of his return, his gross receipts from his private medical practice were $11,698 against which he had deductions of $24,345 (which included $8,093 for car expenses and $9,101 for travel and entertainment expenses) for a net loss of $12,647. Considering these figures, it is surprising that he gave Ms. Guarino the figure of "$150,000 +" as his salary. It is also curious that Schiff, a certified public accountant, would sign a letter stating that Dr. Granovetter's income for 1982 was "expected to exceed $150,000." However, he testified that this figure, which was supplied to him by Dr. Granovetter, represented future expectations rather than present reality, and seemed reasonable to him based on his knowledge of the earnings of other young physicians who were his clients.

(Tr., 10/1/82, pp. 42–47) Schiff's and the debtor's expectations that the debtor would meet with greater success in the practice of medicine in 1982 than he had in 1981 proved to be wrong. In fact, up to October 12, 1982, Dr. Granovetter had earned only about $10,000 working for the New York City Health and Hospital Corporation at the Metropolitan Hospital Center as a resident in emergency medicine. (Tr., 10/12/82, p. 27, *ll.* 13–24; p. 42, *l.* 16—p. 46, *l.* 6)

The information as to his income from his medical practice is not the only inaccuracy in the lease application. All of the information concerning Avatar in the application is untrue. The debtor has conceded as much in the post trial memorandum submitted by his attorneys in which they state, at page 4:

"Dr. Granovetter also told the Sopher agent that he received a salary of $60,000 a year as president of Avatar, Inc. ('Avatar'). This information was false."

As a matter of fact, he testified that he had had no connection with Avatar for about a year prior to his signing the application and that at that time he had owned stock in that company which owned a six-room guest house. (Tr., 10/12/82, p. 26, *ll.* 16–25)

At trial, Dr. Granovetter presented facts in an attempt to establish a two-part defense. First, he argued that he really did not misrepresent his financial situation to Lowell or its agents. He testified that in October, 1981, he commenced practicing with a Dr. Eugene Brown as a junior associate; that his arrangement with Dr. Brown was that fifty percent of whatever income he (the debtor) generated would go to Dr. Brown to cover all expenses and that he and Dr. Brown estimated that his (the debtor's) salary would be $150,000 a year. He also testified that he told Ms. Guarino, the Sopher representative, that $150,000 a year was "what Dr. Brown and I had estimated that my salary would be when I started working with him." (Tr., 10/12/82, p. 16, *l.* 10—p. 17, *l.* 2) His testimony is also to the effect that he told Ms. Guarino that he had an interest in Avatar but that he was no longer associated with it but that she sug-

gested that he lie about his association in the application:

"The reason being that in her feeling the owner of the building also had interests in Florida and that it would make him sympathetic towards a lower rental figure."

(*Id.,* p. 19, *ll.* 1–10)

Dr. Granovetter also presented evidence in support of a second defense of frustration of purpose which, he argues, would release him from liability on the lease. According to his testimony, his intention from the start was not to live in the two apartments, but rather to join them into one and then to sublet it at a profit. The lease contains plans for joining them, and his testimony, that he planned to sublet them, was supported by Zager, who recalled that he told him that that would pose no problem under the terms of the lease. (Tr., 10/12/82, p. 66, *ll.* 3–7) In furtherance of this plan, the debtor retained one John Ditmore ("Ditmore"), an estimator for American Carpenters, a company which does carpentry work and alterations, to determine the feasibility of the alterations which would be necessary to join the two apartments. (Tr., 10/12/82, p. 3, *l.* 13; p. 5, *l.* 9) Ditmore testified that on March 5, 1982 (the date on which the debtor wrote Plaintiff's Exhibit 13, the letter to Zager advising him that he (the debtor) would be "unable financially to comply with" the lease), he examined the two apartments and discovered that one was sixteen inches higher than the other. (*Id.* p. 5, *l.* 5, p. 6, *l.* 4) Ditmore testified that while "it is possible" to join the two apartments into one (*Id.* p. 11, *ll.* 6–15), he felt that joining them would have been "poor design" and "possibly hazardous" and that in his professional opinion such a union should not be undertaken. (*Id.* p. 11, *l.* 18, p. 13, *l.* 15) He testified that on March 5, 1982, the day he made the inspection, he "pointed out to Dr. Granovetter that the two apartments were on different floor levels" and that it was not feasible to join them together. (Tr., 10/12/82, p. 6, *l.* 25—p. 7, *l.* 8) At trial, the debtor testified that this was the reason he breached the lease (*Id.* p. 48, *ll.* 2–15) despite the

reason contained in his letter to Zager dated March 5, 1982, Plaintiff's Exhibit 13.

During the first day of trial, at which Dr. Granovetter failed to appear due to what his attorney characterized as a "law office failure" (Tr., 10/1/82, p. 2, *l.* 17), his attorney requested that the plaintiff go forward with its case since it had subpoenaed witnesses, and that if the complaint "does serve (*sic*) a motion to dismiss" he would request permission to apply for a continuance "for Dr. Granovetter to testify." (*Id.* p. 3, *ll.* 4–10) I granted the request since I felt that "[the debtor] should not be precluded from putting in a defense." (*Id.* p. 5, *ll.* 14–20)

The main thrust of his argument on that day was that the lease had not been entered into by Dr. Granovetter in his individual capacity but had been entered into in his capacity as a professional corporation so that there could be no reliance upon the individual. He pointed out in his opening statement:

"[T]his is a personal bankruptcy; it's a Chapter 7 bankruptcy. The lease which this gentleman is referring to was not entered into by Bruce Granovetter as an individual. The lease is between Lowell Holding Company and Bruce Granovetter, M.D. P.C., and the lease is not for that matter also, your Honor, guaranteed by Dr. Granovetter in his individual capacity. I think that is a distinction which does have some merit, because there is not proceeding here seeking Bruce Granovetter, M.D. P.C. bankruptcy. There is a distinction between the individual."

(Tr., 10/1/82, p. 16, *ll.* 4–14)

He then went on to say:

"[A]nd as a matter of fact, in the complaint in the Supreme Court of New York, which Bruce Granovetter, M.D. P.C. commenced against Lowell Holding Company (*sic*), the first allegation there is at all times mentioned the plaintiff was and is a domestic corporation organizing an existance (*sic*) pursuant to the provisions of Article 15 of the business corpo-

ration law (*sic*) of the State of New York."

(*Id. ll.* 17–25)

He concluded his opening statement with the following:

"[A]gain, to reiterate where I started off, Bruce Granovetter did not sign the lease. The corporation did, your Honor."

(*Id.* p. 18, *ll.* 19–21)

After the plaintiff rested, the attorney for the debtor commenced his argument on a motion to dismiss as follows:

"[I] would like to move to dismiss the petition (*sic*) for several reasons. One, it is evident that the debtor here is not a party to the lease which is the basis of the claim which the company here is making. There is a distinction between an individual and a corporation. It is clear from the testimony that, and the documents, that the corporation is the tenant. Mr. (*sic*) Granovetter signed for the corporation. The rider to the lease refers to the corporation and that (*sic*) is not individually a party to the lease, which is the subject of the claim here by Lowell Holding Corporation."

(Tr., 10/1/82, p. 93, *ll.* 8–19)

I was very impressed with this argument and was seriously considering dismissing the complaint on that ground. However, I decided to reserve decision on the motion and I adjourned the case until October 12, 1982 so that the defendant would have an opportunity to put in his defense.

To my surprise, on October 7, 1982, I received the following letter from counsel for the debtor, dated October 6, 1982:

"Dear Judge Price:

I was successful in contacting Dr. Granovetter this morning and he has been advised that the conclusion of the hearing is scheduled for October 12, at 9:30 in the morning.

In my review of the proceeding which took place last week, Dr. Granovetter brought to my attention the following fact. Dr. Granovetter did not have a P.C. The basis for my presentation that the debtor had a P.C. was:

1) The lease (Exhibit 3) refers to a 'P.C.'

2) The complaint in the State Court action (Exhibit A) refers to a P.C. and

3) Lowell Holding Corp's answer in the State Court action (Exhibit B) also established to my satisfaction that the debtor had a P.C.

I wanted to bring this to the Court's attention as soon as I learned of this problem."

It is manifest that Dr. Granovetter had never organized a professional corporation and was never authorized to conduct business in that capacity. (Tr., 10/12/82, p. 22, *ll.* 11–15) It is apparent to me that he held himself out as such to Lowell's representative who drew the lease; to his attorneys, Fruitbine, Weiner, Harwin & Herman, P.C., who represented him in the action he caused to be brought in the Supreme Court, New York County in the name of Bruce Granovetter, M.D.P.C. as plaintiff in which the following appears in the complaint:

"1. At all times hereinafter mentioned as at present, the *plaintiff was and is a domestic corporation organized and existing pursuant to the provisions of Article 15 of the Business Corporation Law* of the State of New York." Defendant's Exhibit A (emphasis mine)

and to Patrick Barth, Esq., who is representing him in this proceeding. Where else would all of them have obtained this information except from Dr. Granovetter? It is obviously a figment of his imagination which he used to deliberately mislead them for his own benefit. I do not believe his testimony that "the first time [he] had knowledge that [the lease] was purportedly signed by M.D.P.C." was when Mr. Barth told him about it a few days before his appearance in court on October 12, 1982. (Tr., 10/12/82, p. 22, *ll.* 19–22)

However, this is not the only example of Dr. Granovetter's disregard for the truth that appears in the record. There is, for example, his March 5 letter to Zager in which he claims that his anticipated sale of real property had fallen through. The sale had not fallen through. There never had

been a sale anticipated. Avatar did not even own any property in Key West at the time. Like other of Dr. Granovetter's representations, this was not true.

What is relevant to the case at hand is that I believe the debtor intentionally misstated his financial condition on the lease application which he signed for Sopher. The first misrepresentation was when he claimed that his income was "150,000 + ." The lease application did not ask for future income, estimated income, or expectations, nor did Dr. Granovetter so qualify his representation when he gave the information to Ms. Guarino. I do not believe his testimony that he told her that this was the income which he and Dr. Brown anticipated he would earn. I believe he told her that his salary was $150,000 + and that representation was not true. He also admittedly lied when he claimed to be president of Avatar, Inc. and was engaged in real estate development. There are, then, two written misstatements of financial position which I conclude were not inadvertent but rather made with the intention to deceive.

The debtor argues that the misstatement regarding Avatar is legally irrelevant because, he claims, Ms. Guarino was aware of the truth. Again, I do not believe his story that she knew he had no interest in Avatar, but nevertheless told him to include his former position in it, and income from it, in the application in the hope of getting a lower rent. Putting aside his demeanor when he testified, his story does not make sense because he fails to explain how she learned about Avatar in the first place. There was no reason for him to mention past holdings to her unless he decided to inflate his income by pretending to have connections with a real estate development corporation. Moreover, he does not explain why his having an interest in Avatar would encourage Lowell to give him a reduced rent. It seems to me that having this additional substantial income would be more likely to make Lowell's position firmer. Finally, he clearly had a motive aside from any purportedly supplied by Ms. Guarino to pretend that he had an income from Avatar: he must have concluded that if Lowell knew the true state of his finances it would not grant him a lease for the apartments.

I also do not believe the debtor's claim that he breached the lease because the apartments could not practically be joined together. First, he did not mention this problem to Zager in the March 5 letter in which he stated his intention to breach although he had purportedly been advised of it by Ditmore. Zager claims the debtor also did not mention it when Zager talked with him after receiving the letter. (Tr., 10/12/82, p. 70) Instead, in this letter, Dr. Granovetter explained that he could not go through with the deal because he was unable to sell his property in Florida. This, of course, was a bold misstatement since he had owned no Florida property for over a year. I do not believe that an individual who had as serious a problem with using the apartments as Dr. Granovetter claimed he had would not have used that to explain his reason for refusing to honor the lease rather than fabricate an excuse. Second, there was another compelling reason for the debtor to breach: he did not have enough money to honor the check for $8,533.33 which he had given to Zager. (Tr., 10/12/82, p. 54, l. 21—p. 55, l. 20; cf. Plaintiff's Exhibit 12, showing Dr. Granovetter's January to February checking account statement)

Having determined that Dr. Granovetter made two material misstatements in his lease application as to his financial condition, the next question is whether these misstatements cause the debt arising from the lease to be nondischargeable.

Section 523(a)(2)(B) of the Code provides in pertinent part:

"(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt—

\*   \*   \*   \*   \*   \*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

\*   \*   \*   \*   \*   \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such ... property, ... reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive."

▇ The burden is on the plaintiff to prove, by clear and convincing evidence, each element of this section. *National Bank of North America v. Newmark, (In re Newmark),* 20 B.R. 842, 853 (Bkrtcy.E.D.N.Y.1982 (Price, J.)); *Waterbury Community Federal Credit Union v. Magnusson, (In re Magnusson),* 14 B.R. 662, 667 (Bkrtcy.N.D.N.Y.1981). *But cf. Bottari v. Baiata, (In re Baiata),* 12 B.R. 813, 817 (Bkrtcy.E.D.N.Y.1981) (standard of proof under § 523(a) is fair preponderance of the evidence).

There is no question that this is a statement in writing respecting the debtor's financial condition. Although Dr. Granovetter testified that the application had been completed by Ms. Guarino, he also testified that she had done so at his direction. *See supra,* p. 632. This state of facts satisfies the writing requirement of § 523(a)(2)(B). *In re Gonzalez,* 287 F.Supp. 281 (S.D.N.Y.1968); *Investors Consumer Corporation, Inc. v. Goff (In re Goff),* 17 B.R. 564, 567 (Bkrtcy.W.D.Ky.1982). Representations as to salary and other sources of income obviously are representations of financial condition. *Camden National Bank v. Archangeli (In re Archangeli),* 2 C.B.C.2d 1209, 1211 (Bkrtcy.D.Me.1980).

Although there is no direct evidence of intent to deceive other than the debtor's testimony that he conspired with Ms. Guarino to mislead Lowell as to his financial position in hopes of getting a lower rent, the element of intent presents no problem in this case. It is well established that intent may be inferred from a person's actions, and, indeed, there is often no other way to prove it. *See, e.g., In re Berk,* 356 F.Supp. 453, 455 (E.D.N.Y.1973); *Waterbury Community Federal Credit Union v. Magnusson, (In re Magnusson),* 14 B.R. 662, 669 (Bkrtcy.N.D.N.Y.1981); *Rutland Sav-*

*ings Bank v. Norton, (In re Norton),* 11 B.R. 141, 145 (Bkrtcy.D.Vt.1980) "It has ... been held that where a debtor made a false statement to a mercantile agency with knowledge that the statement was to be used for credit purposes, his intent to deceive will be presumed." This debtor, like others, will be held to have "intended the natural and necessary consequences of his act." *Magnusson, supra,* 14 B.R. at 669. Parenthetically, even if I believed Dr. Granovetter's claim that the $150,000 figure was a representation of anticipated income, (Tr., 10/12/82, pp. 16–17), I could still hold that the debtor clearly intended to deceive Lowell. The analysis of Judge Cyr in a similar case is instructive:

"While the debtor testified that his commission sales relationships—offered the potential for realizing the income listed on the financial statement, at the time the debtor published the statement he had no such income and the history of relationships ... does not warrant these exaggerated income projections. These gross exaggerations ... evidence an active intent to deceive."

*Camden National Bank v. Archangeli (In re Archangeli),* 2 C.B.C.2d 1209, 1211 (Bkrtcy.D.Me.1980).

The debtor contends, however, that the legal preconditions for denial of a discharge pursuant to § 523(a)(2)(B) have not been met in three ways. He argues (1) that his statements were not materially false; (2) that Lowell did not in fact rely on any false statements; and (3) that, at any rate, any reliance was not reasonable.

He stresses that his filling in the "income" blank with "150,000 +" was not materially false because his accountant's letter explained that his income was "expected" to be over $150,000. In other words, he contends that his statement was not "false." This attempt at exoneration is unconvincing; as stated above, the Sopher application did not solicit Dr. Granovetter's *expected* income and his later attempts at obfuscation cannot transform a false statement into an honest estimate.

He further claims that Lowell did not in fact rely on his misstatements regarding his income. I agree with this contention of the debtor, although not with his reasoning. (see Plaintiff's post-trial memorandum at 11–14)

■ The dispositive factor in this case is that Lowell repeatedly ignored warnings that Dr. Granovetter was unable to comply financially with the agreement. When a creditor chooses to ignore what have been termed "red flags," there is no clear and convincing evidence of reliance. *W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305, 307–308 (Bkrtcy.S.D.Fla.1982); *First National Bank of Dayton, Ohio v. Breen (In re Breen)*, 13 B.R. 965, 969 (Bkrtcy.S.D.Ohio 1981) (dictum); *cf. National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. 842, 861 (Bkrtcy.E.D.N.Y.1982) (Price, J.); *American Finance Corp. v. Arden (In re Arden)*, 2 B.C.D. 204, 207 (Bkrtcy.D.R.I. 1975) (no reliance under § 17(a)(2) of former Bankruptcy Act when creditor "bur[ies] ... his] commercial head in the sand").

In this case there were at least four instances in which Lowell was alerted to Dr. Granovetter's financial problems. The first "red flag" was the application itself, wherein he represented himself as having a yearly income of over $200,000 but no savings accounts and an average bank balance of only $2,500. At the very least, those seemingly inconsistent figures should have elicited further questions as to what other assets and liabilities he had and how he could be responsible for an additional obligation of over $4,500 per month. But they did not.

Secondly, there was the craftily worded Schiff letter, wherein the accountant wrote that Dr. Granovetter's income was "expected" to exceed $150,000. Prudence should have dictated a demand for clarification of the discrepancy between the representation on the application and the letter. Alone, this misleading letter would not have been a "red flag," but combined with the other indications it was a warning that should have been heeded; however, it was ignored.

Nor did Lowell heed the implicit warning in Dr. Granovetter's December letter to Za-ger in which he said that for *financial reasons* he could not go through with leasing of the apartments. Prudence demanded that after receiving that letter, in light of all that had transpired before, Lowell conduct further inquiries when he renewed negotiations for the apartments. There were, however, no further inquiries.

However, the most alarming "red flag" occurred at the closing, when, contrary to usual policy, Lowell signed a lease with a P.C. without noticing it or asking for an individual guarantee. Most disturbing of all is that Zager took a post-dated check for more than five hundred dollars less than the amount provided for in the lease without any hesitation. Zager testified that he did not notice the post-dating, but he admitted that Dr. Granovetter commented on the check's being too low a figure. *See supra,* p. 634. How could Zager have reasonably believed Dr. Granovetter could have complied with the terms of the lease and paid over $50,000 per year as rent when he could not even tender about five hundred dollars more at the closing? Zager's knowing acceptance of this check convinces me that Lowell was determined to conclude the agreement with Dr. Granovetter and that it was consciously willing to ignore warnings that the debtor's financial representations were inaccurate. Lowell could not have relied on the debtor's application if it repeatedly ignored evidence that should have put a sophisticated, experienced businessman such as Zager on notice. *Cf. Zammitti v. Montbleau (In re Montbleau)*, 13 B.R. 49, 53 (Bkrtcy.D.Mass.1981) ("[t]he pattern of negotiations revealed in the testimony show [the creditor] as a man who was determined to make an investment [with the debtor]"). *Middletown City Employees Federal Credit Union, Inc. v. Shepherd (In re Shepherd)*, 13 B.R. 367, 370 (Bkrtcy.S.D.Ohio 1981) ("A lender has the duty to exercise ordinary prudence in order to avoid the discharge of a debt on the grounds that the debt is for obtaining money or property by ... false representations") (§ 523(a)(2)(A)).

Even if there were reliance, however, there was no reasonable reliance. Dr. Gra-

novetter argues that the reliance was not reasonable in several ways. First, he cites *First National Bank Dayton, Ohio v. Breen (In re Breen)*, 13 B.R. 965 (Bkrtcy.S.D.Ohio 1981) for the proposition that Lowell had an obligation to attempt to verify the information he supplied. In the *Breen* case, the court held that a bank that granted a second mortgage on real estate had an obligation to ascertain the extent of the first mortgage on the property, which could have been accomplished through a single telephone call. *Id.* at 969. Of course, in this case Lowell did in fact ask Dr. Granovetter to verify his income when its agent, Sopher, made the request that ultimately resulted in his producing the misleading letter from his accountant. That he produced verification which was in fact misleading should not nullify the legal impact of Lowell's agent having asked for support of his figures. I believe, however, that more verification was necessary in this case for the reliance to be reasonable in light of the numerous "red flags" waved before Lowell. In so holding, I am not concluding that Lowell's customary practices are inadequate, because Lowell generally did conduct significant independent investigations for major transactions. See *supra* p. 633. Rather, I hold that in a case filled with as many suspicious circumstances as this one, a creditor cannot deviate from its own established procedure and then convince this court that its behavior was "reasonable." See *Telco Leasing, Inc. v. Patch (In re Patch)*, 24 B.R. 563, 567 (D.C.D.Md.1982) ("the reasonableness of a creditor's reliance on a financial statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, and (3) in light of the surrounding circumstances existing at the time the application was made and credit extended"); *Caribank, N.A. v. Diaz De Villegas,* 26 B.R. 600, 603 (Bkrtcy.S.D.Fla.1982) (unreasonable for bank to depart from its usual practice).

Dr. Granovetter also argues that Lowell's reliance on his income figures was unreasonable because it did not solicit his "monthly obligations . . . [i]n order for Lowell to have a claim based on the application statements the application had to portray a net asset worth or net income figure." (Plaintiff's post-trial memorandum at p. 17). In view of my determination that, in light of the numerous "red flags," Lowell did not in fact rely on Dr. Granovetter's representations, and given my holding that under all the circumstances Lowell should have conducted more extensive investigations of the debtor, it is unnecessary for the disposition of this case to determine the reasonableness of Lowell's failure to solicit more information as to his monthly obligations.

Since there was no reasonable reliance in this case, the debt is dischargeable and the complaint is dismissed.

The debtor, relying on section 523(d) of the Code, 11 U.S.C. § 523(d), requests costs and attorney's fees. (Defendant's post-trial memorandum at p. 22).

Section 523(d) provides:

"(d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment against such creditor and in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding to determine dischargeability, unless such granting of judgment would be clearly inequitable."

To award such costs and fees in this case would be inappropriate because first, this is not a consumer debt and, second, the award of costs and fees would be "clearly inequitable."

Section 101(7), 11 U.S.C. § 101(7), defines consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose." In this case, the debtor has consistently maintained that he entered into the lease with Lowell in order to remodel the apartments and sublet them at a profit. He stresses that his immediate plan was not to reside in the apartments. (Tr., 10/12/82, p. 24, *ll.* 11–21). Consequently, this is not a consumer debt under

the plain language of the statute. Dr. Granovetter points to *Bank of Columbia Falls v. Burgess (In re Burgess)*, 22 B.R. 771 (Bkrtcy.M.D.Tenn.1982), for authority that the award of attorney's fees is appropriate in this case. That case is no authority for the proposition that this debtor's obligation was a consumer debt, however, because in *Burgess* the debt was an unsecured obligation incurred by the debtors to purchase real property which they intended to use as their home. *Id.* at 772. Here, by contrast, the debtor leased these apartments to "make a substantial profit" (Tr., 10/12/82, at p. 40, *ll.* 16–17) by renting them.

Even if this were a consumer debt, however, I would not award attorney's fees or costs in this case because the statute forbids such an award. It would be "clearly inequitable" to tax fees and costs when I have found that Dr. Granovetter intended to deceive Lowell. This conclusion comports with the legislative history of Section 523(d), which establishes that the purpose of that provision was to deter creditors from initiating dischargeability proceedings in the hope that a settlement could be forced from a financially embarrassed but honest debtor anxious to avoid attorneys fees and costs. H.R. No. 95–595, 1st Sess. 365, *reprinted in* [1978] U.S.Code Cong. and Ad.News 5963, 6321; S.Rep. No. 95–989, 95th Cong., 2d Sess. 80, *reprinted in* [1978] U.S.Code Cong. and Ad.News 5787, 5866. In light of Dr. Granovetter's numerous significant misstatements, which I have found were made with intent to deceive, Lowell should not be penalized for attempting to prove that the criteria of section 523(a)(2)(B) were met in this case. *Accord, Landmark Finance Corp. v. Quarterman (In re Quarterman)*, 22 B.R. 267, 268 (Bkrtcy.N.D.Ga.1982) (where plaintiff presents a "meritorious complaint, brought in good faith" no attorney's fees should be awarded); *Camden National Bank v. Archangeli (In re Archangeli)*, 2 C.B.C.2d 1209, 1212 (Bankr.D.Me., 1980) (where debtor's "actual intent to deceive" proven, action by creditor is in good faith and the award of attorneys fees and costs is inappropriate).

The debtor's application for costs and attorney's fees is denied.

IT IS SO ORDERED.