In re Sandra L. BOSSARD, Debtor.

BENEFICIAL NEW YORK INC., Plaintiff,

v.

Sandra L. BOSSARD, Defendant.

Bankruptcy No. 86–00466.
Adv. No. 86–0071.

United States Bankruptcy Court,
N.D. New York.

March 30, 1987.

George V. Cook, Baldwinsville, N.Y., for plaintiff.

Frank E. Visco, Sr., Cortland, N.Y., for debtor.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Beneficial New York, Inc. ("Plaintiff") has commenced this adversary proceeding pursuant to Fed.R.Bankr.P. 7001 objecting to the dischargeability of a debt due it from debtor Sandra L. Bossard ("Debtor"). Plaintiff relies upon § 523(a)(2)(B) and § 523(a)(6) of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code"). Debtor has generally denied the allegations. Hearing was held on December 1, 1986, with the parties afforded the opportunity to present evidence, cross examine, and thereafter submit memoranda.

### FINDINGS OF FACT

On or about August 22, 1985, the Plaintiff extended credit to the Debtor in the amount of $7,968.00. Debtor admits that at the time she borrowed this money, she was indebted on other obligations in excess of $9,400.00.

Russell R. Gedman ("Gedman") testified on Plaintiff's behalf. As Branch Manager of Plaintiff's Cortland, New York office, Gedman caused a notice of default and notice of wage assignment to issue to Plaintiff on August 2, 1985; the notices concerned Plaintiff's obligations on a loan entered into in 1981. Debtor then contacted Gedman on or about August 8, 1985, and discussed refinancing the indebtedness. Gedman had no further contact with Debtor until August 22, 1985.

On the morning of this date, Gedman received a phone call from Debtor, and secured financial information which he used to fill in a loan application (Exhibit 1), on her behalf ("Application"). Gedman testified he normally takes financial information over the phone for loan applications, but that the loan applicant reviews the document prior to signing.

Also on this date, Gedman requested a Trans Union Credit Report ("Exhibit 5") prepared detailing Debtor's financial obligations. The report listed a number of debts not shown on the Application. When Gedman discussed the report with Debtor during the afternoon of August 22, 1985, she explained that some of the obligations listed were being taken care of by her estranged husband. This was purportedly the case with a judgment in favor of Rich Plan of Syracuse entered in June, 1985, in the amount of $513.00. A listed debt to Montgomery Ward in the amount of $340.00 was paid by Debtor's husband, with Gedman confirming this by a phone call to the Cortland County Sheriff's Department. Debtor told Gedman that an obligation to the Marine Midland Bank in the amount of $2,310.00 had been paid; Gedman believed this to be true due to the age of the debt.

Gedman relied upon the contents of the Application when he approved the loan to Debtor. He stated the loan would not have been made had he known about the true extent of Debtor's obligations, as she would then not have been able to meet her monthly obligations to Plaintiff. While Gedman knew Debtor was having financial problems, he did not recall her stating that she was considering a bankruptcy filing.

Debtor signed the Application, as well as a Loan Agreement (Exhibit 2) in which she agreed to make forty-eight (48) monthly payments of $166.00, commencing September 22, 1985, until the obligation was paid. Debtor pledged her 1978 Plymouth Horizon as security for the obligation (Exhibit 3), and Plaintiff perfected its interest by recording the lien with the New York Department of Motor Vehicles (Exhibit 4).

Gedman stated that $2,888.00 of the Debtor's loan was paid to Avco Finance ("Avco") to satisfy in full an outstanding obligation. Obligations to Avco in the amounts of $2,500.75 and $200.22 are the only liabilities listed on the second page of the Application. Yet Exhibit 5 lists three outstanding obligations to Avco in the

amounts of $304.00, $2,791.00 and $297.00. The balance of the loan was given to Debtor, who made one payment before defaulting on the obligation.

In November, 1985, the Plaintiff's Cortland office received a letter from Debtor, dated November 12, 1985 (Exhibit 6), in which she explained that she would be filing bankruptcy "jointly with my husband". Debtor explained the automobile was inoperable, that she faced foreclosure on her home, and that she was now pressed with several other bills which she had believed her husband was paying.

On cross examination, Gedman stated he was unaware of whether or not Debtor's husband had filed a petition in bankruptcy when he had the conversations with the Debtor in August, 1985.[1] Gedman was aware the Debtor was jointly obligated with her husband on a mortgage, yet this debt was not listed in the "liability" section of the Application; a mortgage is, however, identified on the first side of the document. With respect to the mortgage, Gedman said he knew Debtor was personally liable thereon, but stated he believed her representations that her husband would be making the payments. He had known the Debtor and her spouse for four or five years at the time of the loan, as he had originally secured financial information from them for the 1981 loan. Additionally, Gedman knew Debtor was separated from her husband at the time of the loan application, and that she had financial difficulties.

Gedman testified he was unaware the Debtor had been hospitalized just prior to the August, 1985 loan; while he questioned Debtor about her general liabilities when he completed the Application, he did not recall asking her specifically about hospital or other medical bills.

Concerning the automobile which served as collateral for the loan, Gedman said he telephoned Debtor at her place of employment after her default, and she told him the car could be found on a street near her home. Approximately two weeks after receiving Exhibit 6, Gedman searched for the vehicle, but it could not be found.

Attorney Frank E. Visco, Sr. ("Visco"), Debtor's counsel, testified he first discussed possible bankruptcy proceedings with Debtor in the spring of 1985. He did not recall a telephone conversation with Gedman on or about August 6, 1985.

Debtor testified she first met Gedman in 1980 or 1981 concerning an automobile loan. At this time, she knew that all her creditors had to be listed on her loan application, including mortgage obligations.

Debtor stated Gedman initiated contact with her in early August, 1985, with an offer of financial assistance. He had learned that Debtor's husband was going to file bankruptcy, and presumed she could use financial help in consolidating her debts, specifically mentioning the Avco obligations. Gedman told her he knew of her hospitalization.

Gedman then telephoned Debtor at her place of employment on various occasions thereafter; on one such occasion, he requested she identify her creditors. Debtor stated she contested this suggestion, but says she finally visited Gedman's office personally on August 22, 1985.

Debtor testified that she brought with her a written list of her creditors, but that the list did not set out debts in her husband's name. The list contained some of the debts which Debtor listed in her bankruptcy schedules; others she did not list either because her husband was then receiving the bill, or because the creditor did not look to her for payment until after her husband's bankruptcy.

Gedman told Debtor not to worry about some of the debts, as her husband's wages could be garnished to satisfy them. She told Gedman that she was still incurring medical expenses associated with her hospitalization, and that her doctor's bills were not covered by insurance. As for the mortgage, Debtor said she informed Gedman at the meeting that foreclosure was imminent,

---

1. The Court notes that Charles Franklin Bossard, Jr. of Cortland, New York, filed his petition for relief under Chapter 7 of the Code on November 26, 1985, in the Northern District of New York.

as she was two months in arrears on her monthly payments of approximately $250.00.

Debtor stated her automobile broke down six weeks after she received the loan; she left the car in a parking area at her home on Water Street in Homer, New York. Debtor testified she telephoned Gedman concerning the automobile's location, and two weeks later Gedman telephoned her and told her to leave the keys and title in the glove compartment. Two weeks later, Debtor's boyfriend told her the automobile was gone; Debtor assumed Plaintiff had repossessed the automobile, but was unsure as she had moved to a new residence after making arrangements with her landlord for leaving the automobile at the Water Street location for at least thirty days. It was at the Code § 341 meeting when she learned that Plaintiff did not take the automobile.

On cross examination, Debtor said she signed the loan agreement based on Gedman's advice and explanation of responsibility for her other loans. Her financial problems began when her husband missed a few child support payments.

In rebuttal, Gedman testified that Visco telephoned him on Debtor's behalf upon her receipt of the garnishment notice, and they discussed the possibility of a consolidation loan, as well as proceedings against Debtor's husband for child support arrearages. After this telephone conversation, Debtor telephoned Gedman on or about August 7, 1985 and told him she would stop in the next day to apply for a new loan. On August 22, 1985, Gedman said Debtor telephoned him, and gave him the financial data which he used to complete the Application. Debtor did not show Gedman a list of creditors on that date, and she told him she did not have the keys, title, or registration for the automobile. They did not discuss bankruptcy proceedings, and the conversation regarding the mortgage centered on Debtor's joint responsibility with her husband. Debtor told Gedman that August 22, 1985 was the date the garnishment on her wages was to begin.

## CONCLUSIONS OF LAW

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).

Plaintiff's allegations with respect to the August 22, 1985 loan and grant of security interest set forth three basis for a finding that the obligation is nondischargeable. Exceptions to discharge are to be narrowly construed. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717, 719 (1915); *Household Finance Corp. v. Danns (In re Danns)*, 558 F.2d 114, 115 (2d Cir.1977). The burden of proving that a debt comes within one of the statutory exceptions of Code § 523(a) is upon the party opposing the discharge of the debt. *Id.* 558 F.2d at 116. Of course, Plaintiff bears the burden of proving each element of its claims by a showing of clear and convincing evidence. *Waterbury Community Federal Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662, 667 (Bankr.N.D.N.Y.1981). This is particularly true in the instant case, for "where dishonesty or fraud is at issue, the courts have typically required a higher standard of proof." *Household Finance Corp. v. Callery (In re Callery)*, 6 B.R. 527, 529 (Bankr. S.D.N.Y.1980) *quoting Kuehne v. Huff (In re Huff)*, 1 B.R. 354, 357 (Bankr.D.Utah 1979).

Plaintiff's first cause of action focuses on the contents of the Application. In pertinent part, Code § 523 provides:

(a) a discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

...

The Plaintiff contends the glaring omission of Debtor's financial obligations from the Application, save for the Avco debts (and to a lesser extent the mortgage obligation), substantiates a finding that the document was materially false.

■ In order to defeat debt dischargeability on the ground that a debtor omitted obligations from a financial statement made or adopted by him, the creditor must expressly or impliedly show the debtor *knew* the obligations existed and could be enforced against him. *Bankers Trust Co. of Albany v. Saunders (In re Saunders)*, Case No. 80–00245, Adv. Pro. No. 80–0043 (Bankr.N.Y.N.Y. May 29, 1981) (Marketos, B.J.). *See also, Southern Discount Co. v. Mausser (In re Mausser)*, 4 B.R. 728, 729 (Bankr.S.D.Fla.1980); *Southern Discount Co. v. Mosley (In re Mosley)*, 4 B.R. 177, 178 (Bankr.S.D.Fla.1980).

■ The conflicting testimony assures only that the Application was prepared by Plaintiff's agent, with at least some of the information contained therein received telephonically. Debtor contends she provided Gedman a written list of obligations, which the latter reviewed and failed to include in the Application. Gedman asserts he was not given a list, and that the loan would not have been made had he been provided the requisite information. Debtor admits, however, that the list which she gave Gedman was incomplete, for it did not contain obligations for which she was jointly liable, yet admittedly not incurring primary payment responsibility. Debtor's failure to disclose substantial, existing obligations renders the loan application materially false. *In re Saunders, supra*, p. 9; *See also, Century Bank of Pinellas County v. Clark (Matter of Clark)*, 1 B.R. 614, 617 (Bankr.M.D.Fla. 1979); *First Service Corp. v. Schlickmann (In re Schlickmann)*, 6 B.R. 281, 284

(Bankr.D.Mass.1980). While Debtor adopted the Application as her own when she signed, and while the incomplete nature of the information rendered the document materially false, the Plaintiff cannot succeed on its first cause of action.

■ Under Code § 523(a)(2)(B)(iii), a creditor must prove he has "reasonably relied" upon a debtor's false financial statement. In a case in which the debtor and creditor collaterally agreed to jointly prepare a financial statement, the Court noted that a creditor's "reasonableness" is to be determined on a case by case approach. *Miller v. Beehner (In re Beehner)*, 76 B.R. 265 (Bankr.N.D.N.Y.1984) (Marketos, B.J.). The Court reviewed one method of analysis which focused upon whether the creditor knew from the outset that the financial statement was inaccurate. *First National Bank of the Black Hills v. Houk (In re Houk)*, 17 B.R. 192 (Bankr.D.S.D.1982). A creditor's failure to verify the information received from a debtor may also make reliance unreasonable. *First National Bank of Dayton v. Breen (In re Breen)*, 13 B.R. 965, 969 (Bankr.S.D.Ohio 1981). Additionally, when a creditor has ignored "red flags" revealing a need for prudence or caution in future dealings, subsequent reliance is unreasonable. *Lowell Holding Corp. v. Granovetter (In re Granovetter)*, 29 B.R. 631, 640 (Bankr.E.D.N.Y.1983); *American Finance Corp. v. Arden (In re Arden)*, —— B.R. ——, 2 B.C.D. 204, 207 (Bankr.D.R.I. 1984) (no reliance under § 17(a)(2) of the former Bankruptcy Act when a creditor "bur[ies] ... his] commercial head in the sand"). As the Court opined with some dismay in a previous instance, a lax and possibly unreasonable attitude in issuing consumer loans of the type concerned with herein may be evidenced by creditor receipt of most of a debtor's pertinent financial information over the telephone. *ITT Financial Services, Inc. v. Sweeney (In re Sweeney)*, 76 B.R. 27 (Bankr.N.D.N.Y.1985) (Marketos, B.J.).[2]

---

**2.** "While the Court is cognizant of modern banking technology, it must emphasize that the current lax financial attitudes may in the long run mitigate against a creditor in a case similar to the one currently before the Court." *In re Sweeney, supra.*

The record belies any argument that Plaintiff reasonably relied upon Debtor's loan application. In the first instance, the document was prepared by Plaintiff's agent with information obtained over the telephone, during the course of one sole telephone conversation. Second, the facts suggest Plaintiff had independent, prior knowledge of the Application's inaccuracies. Gedman said he knew Debtor and her husband were separated, and that she was jointly responsible for the mortgage payment. "Red flags" were raised on the face of the credit report obtained by Gedman, and should have prompted Plaintiff's further investigation. The Court appreciates the fact that it reviews the case after the initial financial arrangements have long passed. The Court also recognizes that Plaintiff does not have the resources of a banking institution, which tend to obviate a strict duty of verification. Yet even if a more relaxed process is justified, it

> would not allow the Plaintiff to blindly rely on any information which was listed on the disclosure form. The failure of Plaintiff to take even routine precautions to investigate the Debtor's financial position demonstrates how little reliance Plaintiff based on the representations made in the disclosure statement.

*In re Beehner, supra,* p. ——.

While partial reliance on a false statement is sufficient to render a debt nondischargeable, the creditor must view the statement within the totality of the debtor's circumstances. *In re Magnusson, supra,* 14 B.R. at 668; *Nationwide Financial Corp. v. Smith (In re Smith),* 2 B.R. 276, 279 (Bankr.E.D.Va.1980). When an objective standard of "reasonable reliance",[3] is used, plaintiff has failed to meet its burden of proof on this element. Consequently, Plaintiff's first cause of action is dismissed.

■ Plaintiff's second cause of action alleges Debtor's "conversion" of the automo-

bile which served as collateral for the loan. Code § 523(a)(6) deems debts nondischargeable when they are due to the "willful and malicious injury by the debtor to another entity or to the property of another entity." This section has been held to include wrongful conversions of property subject to a security interest. *Conkling v. DeBernardis (In re Parks),* 76 B.R. 22 (Bankr.N.D. N.Y.1984) (Marketos, B.J.); *United States v. Lindsley (In re Lindsley),* 76 B.R. 33 (Bankr.N.D.N.Y.1984) (Marketos, B.J.); *Car Village Buick-Opel, Inc. v. DeRosa (In re DeRosa),* 20 B.R. 307, 312 (Bankr.S.D.N.Y. 1982); *Farmers Bank v. McCloud (In re McCloud),* 7 B.R. 819, 822 (Bankr.M.D. Tenn.1980). The conversion must be both willful and malicious, with the former term meaning deliberate or intentional. *Thorp Credit and Thrift Co. v. Pommerer (In re Pommerer),* 10 B.R. 935, 940 (Bankr.D. Minn.1981). The term "malicious" means a wrongful act done consciously and knowingly in the absence of just cause or excuse. *In re DeRosa, supra,* 20 B.R. at 313.

■ Debtor contends she put the keys and title to the automobile in its glove compartment at Gedman's request. The party asserting an affirmative defense bears the burden of establishing it by the necessary proof. *In re Saunders, supra,* p. 6; *Tendler v. Jaffe,* 203 F.2d 14, 17 (D.C.Cir.) *cert. denied,* 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344 (1953).

While Debtor's version of what happened to the automobile is somewhat incredible, she appeared to be a credible witness. The disappearance of the automobile presents a close question for the Court, and while it is true that a fraudulent conversion may be proven by review of the totality of the circumstances, each element of conversion must be substantiated with clear and convincing proof. The fact that the automo-

---

**3.** "An objective standard by which to measure 'reasonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements which are obtained primarily with a view to the exception to discharge if the debtor defaults and declares bankruptcy. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. 130 (1977)." *In re Magnusson, supra,* 14 B.R. at 668–69, n. 1.

bile's ultimate whereabouts are seemingly unknown by either party does not and cannot suffice for proof that the Debtor took active, willful, and malicious steps to convert the collateral. Thus, in a case where a debtor returned twenty-two cows to his secured creditor when thirty cows had been collateral for the debt, and explained only that eight of the cows had died, the Court held that the creditor had failed to prove actionable conversion warranting a finding of nondischargeability. *Montag v. Snell (In re Snell)*, 74 B.R. 108 (Bankr.N.D.N.Y. 1985) (Mahoney, B.J.). The creditor failed to advance any evidence suggesting any other cause for the cows' disappearance. Noting the debtor had been contractually obligated to provide the creditor with proof of death, and had failed to do so, the Court recognized that

> while a 'technical' conversion of the eight cows may have taken place, the plaintiff has failed to prove the elements of willfulness or maliciousness necessary to except the liability from discharge. *Crebbs v. Epperson (In re Epperson)*, 45 B.R. 708, 711 (Bankr.E.D.Tenn.1985) *Accord, Lebanon Production Credit Asso. v. Walker (In re Walker)*, 44 B.R. 1, 3 (Bankr.S.D.Ohio 1983).

*Id.* at p. 111.

The result is the same in the present case. The evidence offered by Plaintiff concerning a conversion of the automobile is insufficient to sustain its second cause of action, and it is consequently dismissed.

■ Plaintiff's third cause of action is based upon Code § 523(a)(2)(A), which excepts from discharge any debt

> (2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud. ...

In order to succeed on this claim, the Plaintiff must establish the following facts:

1) The debtor has made representations of fact to the creditor;

2) The representations were false;

3) The debtor knowingly and fraudulently [i.e., with the intent and purpose to deceive] made the representations. The

debtor's act must involve moral turpitude or intentional wrong. Fraud implied in law which may exist without imputation of bad faith or immorality is insufficient; and

4) The creditor relied on the misrepresentation to its detriment.

*In re Saunders, supra*, p. 12; *Key Bank v. Sarkin (In re Sarkin)*, 76 B.R. 24 (Bankr. N.D.N.Y.1984) (Marketos, B.J.); *Cortland Savings Bank v. Evangelista (In re Evangelista)*, Case No. 83–00001, Adv. Pro. No. 83–0037 (Bankr.N.D.N.Y. Feb. 10, 1984) (Marketos, B.J.); *Minority Equity Capital Corp. v. Weinstein (Matter of Weinstein)*, 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983); *Bishop v. Greenblatt (In re Greenblatt)*, 8 B.R. 994, 997 (Bankr.E.D.N.Y.1981).

The question of a debtor's intent to deceive or defraud is a question of fact. *California State Employee's Credit Union v. Nelson (In re Nelson)*, 561 F.2d 1342, 1347 (9th Cir.1977). Further "(t)he ultimate facts required to make ... [Code § 523(a)(2)(A)] operative must, ... be inferred in most instances ... since they involve a conclusion as to the state of mind of the maker of the representations." *United Retailers of Easton, Inc. v. Falk of Bethlehem (In re Falk of Bethlehem)*, 3 B.R. 266, 275 (Bankr.D.N.J.1980). Circumstantial evidence may be used to infer fraudulent intent, as

> Direct proof of fraudulent intent is rarely available. Therefore, intent to deceive may be inferred when the totality of the circumstances present a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the lender. The representation coupled with his conduct is sufficient to permit the court to infer requisite intent.

*In re Schlickman, supra*, 6 B.R. at 282; *Matter of Granovetter, supra*, 29 B.R. at 639; *Brad Ragan, Inc. v. Holcombe (In re Holcombe)*, 23 B.R. 590, 592 (Bankr.E.D. Tenn.1982); *Matter of Clark, supra*, 1 B.R. at 617.

Based on the facts, the Plaintiff has not sustained its heightened burden of proof. Plaintiffs third cause of action is based on the suggestion that Debtor secured the loan at a time when she intended to file a bankruptcy petition, knowing the obligation would be dischargeable. The evidence suggests only that Debtor had contacted her attorney some months in advance of the actual loan date concerning a possible bankruptcy filing. Additionally, the timing of Debtor's bankruptcy filing came nearly three months after the loan was advanced, and after she had made the first installment payment. The record reveals Debtor's critical financial condition resulted due to her inability to receive regular child support payments; it was this factor which resulted in her default on the loan obligation. While the circumstances surrounding the entire transaction between Plaintiff and Debtor were unusual, the proof presented does not support a finding that Debtor intended to defraud the Plaintiff at the time she received the loan in August, 1985. Plaintiff's third cause of action is thus dismissed.

When a creditor requests a determination of dischargeability under Code § 523(a)(2), and judgment is entered for the debtor, the Court is obligated to award the debtor costs and a reasonable attorney's fee. Such award is required when the Court finds that the creditor's position was not substantially justified, unless special circumstances would make the grant unjust. Code § 523(d).

Plaintiff's reliance on the application was not substantially justified. Plaintiff's agent knew of Debtor's financial condition, and was aware of her joint liability on certain debts, yet he ignored the "red flags" raised on the face of the application. Were Code § 523(a)(2) the only basis of Plaintiff's adversary complaint, an award of costs and reasonable attorney's fees would be statutorily warranted.

However, Debtor's explanation of the automobile's disappearance, while not sufficient to sustain a finding of nondischargeability, is sufficient to constitute special circumstances which would make an award of costs and fees unjust.

As a result of the foregoing, it is

ORDERED:

1. The debt due Beneficial New York, Inc., as scheduled by Debtor, is dischargeable.