**In re Raymond D. and Kazuko MARTZ, Debtors.**

**LANDMARK LEASING INCORPORATED,**
**Plaintiff,**

**v.**

**Raymond D. and Kazuko MARTZ, Defendants.**

**Bankruptcy No. 86–05426S.**
**Adv. No. 87–0602S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 30, 1988.

As Amended July 22, 1988.

Robert Lapowsky, Peter Cilio, Philadelphia, Pa., for plaintiff.

Geri Gallagher, Norristown, Pa., for defendants.

Christine Shubert, Tabernacle, N.J., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### INTRODUCTION

The instant adversary proceeding illustrates the difficult burdens placed upon a creditor in attempting to have debts declared nondischargeable on the ground that the debtors issued false financial statements to the creditor in connection with the incurrence of the debts in issue, pursuant

to 11 U.S.C. § 523(a)(2)(B). The creditor must establish, by clear and convincing evidence, the coalescence of all of the four items recited in § 523(a)(2)(B) as to any misrepresentation—including materiality of the misrepresentation reliance upon it by the creditor, and "intent to deceive" on the part of the debtors—in order to prevail. The weakness of one or more of the elements of § 523(a)(2)(B) as to each of the alleged misrepresentations here dooms the creditor to defeat.

## FINDINGS OF FACT

1. The Plaintiff is a corporation engaged in the business of leasing equipment and motor vehicles to businesses.

2. Martz has worked in the hotel and restaurant industry for the past thirty (30) years.

3. Since approximately 1975, Martz was a minority stockholder and President of Universal Dining Concepts (hereinafter referred to as "UDC"), which at one time simultaneously operated as many as eleven (11) hotels and seventeen (17) restaurants and bars in several different cities.

4. Prior to October, 1985, Edward J. Halloran (hereinafter referred to as "Halloran") was the majority stockholder of UDC and his financial resources caused UDC to be very profitable through 1984. However, in 1984, Halloran received certain adverse publicity and began experiencing serious financial difficulties when numerous creditors of UDC operations demanded immediate payment simultaneously.

5. Among the difficulties facing UDC was its inability to pay withholding taxes to IRS. Halloran sold two hotels owned by UDC to pay an IRS debt of $4,800,000.00, and apparently sold most of the other UDC holdings to pay other debts. UDC continued to owe approximately $160,000.00 in withholding taxes to the IRS as of October, 1985.

6. Although potentially liable for these taxes as the President of UDC, Martz credibly testified that he never considered them to be his actual liability, because Halloran always took care of such matters.

7. In October, 1985, Martz acquired all of the stock in UDC in order that he could retain several of the restaurants, which were themselves profitable. However, he miscalculated the liability to the IRS and the ability of the IRS to proceed against the profits of the successful restaurants. Ultimately, the actions of the IRS resulted in the failure of all of the businesses.

8. One of the restaurants owned by UDC was Cafe Raymon, a restaurant located in Dresher, Montgomery County, Pennsylvania, which was itself a profitable business. However, the actions of the IRS had apparently caused financial difficulties for Cafe Raymon as of summer, 1985. Therefore, Martz approached First Financial Funding Corporation (hereinafter referred to as "1st Financial"), a loan brokerage firm of which the principal was Dewey Yesner (hereinafter referred to as "Yesner"), to attempt to obtain a loan for it. 1st Financial and Yesner had, in the past, handled transactions involving as much as $1 million for Martz and UDC.

9. Kazuko, the co-Defendant, testified that she worked from time to time as a chef in connection with UDC's restaurants, but that she considered her primary responsibility to be a homemaker and caretaker of the couple's children, 17-year-old twins. In her brief testimony, Kazuko, who is of Japanese birth, revealed difficulty with the English language, and it is apparent that she had no knowledge of Martz's business dealings. Kazuko supplied her signature on business documents due to her complete confidence in her husband's supervision of the Debtors' business dealings.

10. 1st Financial, in attempting to obtain funds for Cafe Raymon, devised an arrangement whereby the Plaintiff would purchase certain equipment in and for the restaurant, pay the restaurant for equipment already there; purchase new equipment; and lease the equipment back to Cafe Raymon.

11. In furtherance of this arrangement, 1st Financial sent the Plaintiff a Leasing Request. The Leasing Request named the proposed lessee-borrower as "Cafe Ray-

mon, a Proprietorship" and the Debtors as proposed guarantors of Cafe Raymon.

12. Included with the Leasing Request were the following documents:

a. IRS 1040 form of the Debtors for 1982 and 1983.

b. A balance sheet for "Cafe Raymon, Inc." dated March, 1985, showing $163,386.00 equity.

c. A Proforma for Cafe Raymon dated December 21, 1984, with attachments, showing net profit of $327,956.00 (presumably for the year 1984).

d. Three credit references of Martz.

e. A personal financial statement of Martz dated December 31, 1983, showing equity of $745,632.70.

13. Testifying on behalf of the Plaintiff at trial of this proceeding were Scott McMahon (hereinafter "McMahon"), its leasing manager, and Louis Gibson (hereinafter "Gibson"), in charge of new business development and sales for the Plaintiff. Most of the testimony was adduced from McMahon, and he apparently performed all of the investigation done by the Plaintiff relative to this loan.

14. Although a credit search of Martz was included with the Leasing Request, the Plaintiff ran its own search on Martz. The Plaintiff's search yielded a number of existing revolving credit charge accounts plus existing accounts with Sovran Bank, Industrial Valley Bank (hereinafter referred to as "IVB"), and Sears. The report also indicates inquiries from approximately eight (8) financial institutions between the period of September, 1984, and August, 1985, including Colonial National Bank and Security Pacific Consumer Discount Co. McMahon regarded the credit report as showing excellent credit.

15. McMahon contacted the three credit references given by Martz with the following results:

a. Jack Davis of IVB advised that Martz had an interest in two Italian restaurants and that he had a high credit of $450,000.00 secured by real estate that was paid as agreed.

b. R.K. Leasing indicated that Martz was a very good, long-time customer with a high credit of $300,000.00, that Martz dealt in restaurant and hotel equipment, and that he owned a bridal shop.

c. F.W. Michael of Michael Leasing advised that Martz was a former manager of a Ramada Inn with four outstanding leases that were being paid as agreed with a high credit of $25,000.00.

16. The personal financial statement of Martz showed assets and liabilities including the following:

| Assets | | Liabilities | |
|---|---:|---|---:|
| Cash in Bank | $ 25,000.00 | Accounts payable | $ 1,287.71 |
| Deposits | 1,562.06 | Short-term Notes— | |
| Land | 50,000.00 | IVB | 15,000.00 |
| Buildings | 520,000.00 | BA Business | 27,600.00 |
| Horses | 345,000.00 | Long-Term Notes— | |
| Equipment | 39,792.99 | IVB | 29,999.64 |
| Personal Property | 170,000.00 | BA Business | 200,000.00 |
| | | Doylestown S & L | 110,000.00 |
| TOTAL ASSETS (less depreciation) | $1,129,620.05 | TOTAL LIABILITIES & EQUITIES | $1,129,620.05 |

17. In addition to the listed credit references, McMahon contacted the following creditors listed on the 1983 financial statement, who indicated as follows:[1]

---

1. McMahon apparently confused these creditors in his testimony, since the parties have stipulated that Doylestown S & L held the first mortgage on the Debtors' home in the face amount

a. B.A. Business Credit (hereinafter "BA Business") advised that Martz had a $100,000.00 high credit with a balance of $94,000.00 that was paid as agreed.

b. Doylestown Federal Savings & Loan Association (hereinafter "Doylestown S & L") advised that they held the first mortgage on the Debtors' residence, and that the present balance was $227,363.00.

18. On or about August 30, 1985, McMahon met with Robert Rudolph (hereinafter referred to as "Rudolph"), the Plaintiff's President, and Gibson to consider the Leasing Request and supporting documentation. At this meeting, the Leasing Request was approved pending receipt of only an updated financial statement from Martz and obtaining pictures and literature on the equipment proposed to be leased. No Dun & Bradstreet report or similar business report was obtained for the Cafe Raymon despite McMahon's testimony that this was the Plaintiff's normal practice.

19. On September 4, 1985, in furtherance of the transaction, the Plaintiff entered into an Equipment Lease agreement with Cafe Raymon for certain of the Cafe's present restaurant equipment. The agreement provided for payments by Cafe Raymon of $1,643.00 for sixty-three (63) months (a total of $103,509.00), which was personally guaranteed by the Debtors.

20. On September 6, 1985, the Plaintiff received a Confidential Personal Statement

(hereinafter referred to as "the Statement") of Martz dated September 4, 1985, in response to its request for an updated financial statement, and a check in the amount of $4,929.00 for three months' advance payments on the Equipment Lease. The Plaintiff deposited this check on the same day.

21. There were never any direct discussions between the Plaintiff and the Debtors concerning the Debtors' financial picture at any time.

22. Martz testified that he signed the Statement either in blank or without reviewing the information contained in the Statement because he trusted Yesner and 1st Financial to appropriately handle all paperwork in the transaction as a result of successful, previous, larger transactions, and indicated that he had not completed it nor discussed its contents with anyone. Kazuko did not sign or review the Statement at all.

23. The parties stipulated that Yesner would have testified that he wrote Martz's name and address at the top of the Statement, but did not complete anything further on it. The parties accuse each other of filling it out. We believe it is likely that some employee of 1st Financial other than Yesner in fact did complete it.

24. The Statement includes the following entries (Entries noted with an asterisk (*) are identical to entries on Martz's December 31, 1983, Balance Sheet):

| Assets | | |
|---|---|---|
| Cash on hand and in Banks | $ | 35,000.00 |
| Accounts Receivable | | 40,000.00 |
| Real estate owned | | 650,000.00 |
| Autos/personalty | | 170,000.00* |
| Equipment | | 39,792.99* |
| Horses | | 450,000.00 |
| Deposits | | 1,562.06* |
| TOTAL ASSETS | | $1,386,355.05 |

| Liabilities | | |
|---|---|---|
| Note Payable | $ | 27,600.00* |
| Accounts Payable | | 1,287.71* |
| Real estate mortgages | | 310,000.00 |
| Net worth | | 1,047,467.34 |
| TOTAL LIABILITIES AND NET WORTH | | $1,386.355.05 |

of $94,000.00, and that BA Business held the first mortgage on the Debtors' horse farm in the

face amount of $230,000.00.

25. In addition to the foregoing, the Statement indicates a "salary" of $225,-000.00 on its face. On its reverse side, it recites that the Debtors owned a horse farm, worth $425,000.00 and encumbered by a mortgage in the amount of $198,-000.00, and a home worth $225,000.00 encumbered by a mortgagee in the amount of $90,000.00. No contingent liabilities are listed.

26. On September 6, 1985, McMahon, Rudolph, and Gibson again met and discussed the transaction. At that time, they reviewed and compared the documents supplied in connection with the Lease Request. At that meeting, questions were raised regarding the $35,000.00 in bank accounts, the listed value of the real estate, and the listed value of the horses. However, Rudolph indicated that, from his knowledge of horses, the value attributed could be accurate. No further questions were raised to 1st Financial, nor did the Plaintiff attempt to verify or investigate these assigned values further. According to McMahon, the Plaintiff's "final approval" of the transaction was given at this time.

27. McMahon testified that, if the Debtors' financial statement had not been strong, that the Plaintiff would "probably not" have entered into the deal "as easily as we would have gone along with it."

28. McMahon and Gibson both testified that Martz's excellent credit history were relied upon heavily by the Plaintiff in its decision-making process. Gibson testified that Martz's creditworthiness was the most important factor in reaching this decision.

29. The only other action taken by the Plaintiff thereafter was obtaining a lien search on the equipment leased, dated September 11, 1985. This search indicated that some of Cafe Raymon's equipment was pledged, but that the equipment covered by the lease agreement was free and clear of any prior liens. Gibson examined the equipment and obtained photographs of and literature describing it. No title search was done on the Debtors' realty because it was not pledged as security in the transaction.

30. The Plaintiff issued its check to Cafe Raymon in the amount of $50,000.00 on September 16, 1985.

31. In fact, as of September 4, 1985, the Debtors' jointly-owned home was encumbered by not only a first mortgage in favor of Doylestown S & L in the face amount of $94,000.00, but also by a second mortgage in favor of Continental Bank in the face amount of $121,000.00.

32. As of September 4, 1985, the Debtors owned a horse farm in Buckingham, Pennsylvania, and it was encumbered by not only a first mortgage in favor of BA Business in the face amount of $230,000.00, but also by a second mortgage in favor of First Peoples Bank of New Jersey in the face amount of $110,000.00 and a third mortgage in favor of Continental Bank in the face amount of $121,000.00.

33. Martz testified that the mortgages to First Peoples Bank and Continental Bank were for business debts and that he was unaware, in September, 1985, that these debts were secured by mortgages on his home and farm, respectively.

34. Martz testified that he did, at times, have $35,000.00 in his personal account, but that he used his personal account to pay business expenses.

35. Martz further testified that, in his opinion, as of September 4, 1985, he did own automobiles and other personal property worth $170,000.00, including a horse van, a tractor, a limousine, and seventeen (17) automobiles. Martz indicated that some of the automobiles were used in the hotel company and others were used for the horse farm.

36. Martz also testified that the Debtors did own equipment in the amount of $39,792.99, including a seed spreader and various garden equipment.

37. Finally, Martz testified that he believed that $225,000.00 was an accurate estimate of his annual gross income in 1985.

38. Martz was generally a credible witness and no evidence to rebute any of these assertions, or any of his other testimony, appears of record. We are skeptical only of his ignorance that First Peoples Bank and Continental Bank had mortgages on

his realty but, in light of his generally reliable credibility, we will accept the accuracy of this testimony.

39. On December 16, 1985, UDC filed a bankruptcy case after the IRS seized the liquor license of the Conventry Inn, another restaurant owned by it. Martz did not inform the Plaintiff about this filing.

40. In December, 1985, the Plaintiff received a second application from 1st Financial which proposed the purchase of new restaurant equipment by the Plaintiff which would then be leased to Cafe Raymon and again guaranteed by the Debtors. Martz testified that this further transaction had been contemplated and tentatively approved when the transaction of September, 1985, had been consummated.

41. The Plaintiff did not require Martz to update the Statement prior to entering into the second lease agreement, and McMahon testified that, while the Plaintiff considered the Statement in connection with the second lease agreement, the only thing that was required in connection with the second lease was that the payments be current on the first lease agreement, which they were in January, 1986.

42. Prior to execution of the second lease agreement, the Plaintiff requested copies of the Debtors' income tax forms from 1984 and 1985. However, since these forms had not been prepared, the Plaintiff accepted the estimate of the Debtors' personal accountant that their income for each year was approximately $100,000.00.

43. Also, on January 3, 1986, the Plaintiff ran a lien search on Martz personally. This search revealed five UCC filings in addition to those of the Plaintiff which had not been mentioned in the Statement.

44. No other action was taken by the Plaintiff before consummating the second transaction. McMahon's file indicated that the transaction was approved on either December 14, 1985, or December 19, 1985; and the check to the vendor of the equip-

ment, in the amount of $25,191.50, was issued by the Plaintiff on January 16, 1986.

45. Payments were made under lease agreements until June, 1986. Thereafter, default occurred, the Plaintiff sold the equipment at auction, and apparently now seeks a deficiency. The parties agreed not to litigate the amount claimed by the Plaintiff at this time.[2]

46. The Schedules filed by the Debtors in their bankruptcy case list numerous debts which were not included in the Statement, including the following:

a. Colonial National Leasing in the amount of $17,000.00. This debt arose some time in the fall of 1985 and is listed as disputed on the schedules;

b. IVB in the amount of $493,154.54. This was a mortgage for real estate owned by UDC which was guaranteed by Martz. This debt was incurred prior to September 4, 1985. The restuaurant securing that mortgage has since been sold.

c. IVB Bank in the amount of $18,008.00 which was a personal line of credit that arose prior to September 4, 1985.

d. R.K. Leasing in the amount of $200,000.00 which arose prior to September, 1985. The personal liability on this debt is disputed.

e. Security Pacific Consumer Discount Co. in the amount of $44,169.85 which arose in February, 1985.

47. The bankruptcy schedules show the following debts incurred by Martz only which arose in November, 1985, when he purchased the remaining shares in UDC:

| a. | Betsy Ross Plaza | $180,000.00 |
|----|----|----|
| b. | Halloran | 250,000.00 |
| c. | IRS | 160,000.00 |
| d. | Pennsylvania Departments of Revenue, Labor and Industry | (no amount recited) |

*States v. Stelweck,* 86 B.R. 833 at 844–845 (Bankr.E.D.Pa.1988).

---

**2.** We would be reluctant to litigate these damages in our court in a dischargeability proceeding in any event. *See In re Stelweck, United*

48. The Debtors' Schedules list debts totalling $2,329,063.00 and assets of but $695,950.00. The latter figure includes realty valued at $690,000.00; cash of $200.00; household goods of $4,000.00; books, pictures, and collections of $50.00; and motor vehicles of $1,000.00.

## CONCLUSIONS OF LAW

1. The only clearly erroneous aspects of Martz's 1985 Confidential Personal Statement were its failure to include all of the mortgage obligations on the Debtors' real property and failure to disclose the Debtors' contingent liability on various business debts including liability for back taxes for UDC.

2. The Plaintiff has failed to prove that any of the erroneous statements were "materially false;" that it reasonably relied upon the Statement; and that the Debtors acted with "intent to deceive" as to any of the erroneous statements therein.

3. The Plaintiff has thus failed to prove all of the prerequisites of 11 U.S.C. § 523(a)(2)(B) by clear and convincing evidence as to any of the alleged misrepresentations in issue.

4. The obligations of the Debtors to the Plaintiff are dischargeable.

## DISCUSSION

As is clear from the foregoing, the Plaintiff maintains that the Debtors' indebtedness to it is nondischargeable because the debts were incurred as a result of its reliance upon a materially false financial statement pursuant to 11 U.S.C. § 523(a)(2)(B). That Code section provides that a debt is not discharged if it is

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> .    .    .    .    .
>
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

> (iv) that the debtor caused to be made or published with intent to deceive ...

Any dischargeability matter must be approached with the acknowledgement that the purpose of the bankruptcy laws is to provide the debtor with a "fresh start" by granting comprehensive relief from the burden of his or her indebtedness. *See, e.g., In re Gaebler,* 83 B.R. 264, 267 (Bankr.E.D.Pa.1988); and *In re Woerner,* 66 B.R. 964, 971 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa. April 28, 1987). In light of this principle, any exceptions to discharge " 'must be construed strictly against the objector and liberally in favor of the debtor.' " *Id.*

As in the case of § 523(a)(2)(A), *see, e.g., In re Fitzgerald,* 73 B.R. 923, 926 (Bankr.E.D.Pa.1987), all of the statutory prerequisites of § 523(a)(2)(B) must be proven by clear and convincing evidence by the plaintiff in a dischargeability case based on this Code section. *See, e.g., In re Bogstad,* 779 F.2d 370, 372 (7th Cir.1985); *In re Bonnett,* 73 B.R. 715, 717 (C.D.Ill. 1987); *In re O'Karma,* 46 B.R. 422, 423 (M.D.Pa.1984); *In re Figueredo,* 84 B.R. 856, 857 (Bankr.S.D.Fla.1988); *In re Lippert,* 84 B.R. 612, 617 (Bankr.D.Minn.1988); *In re Duncan,* 81 B.R. 665, 667 (Bankr.M. D.Fla.1987); *In re Bossard,* 74 B.R. 730, 734 (Bankr.N.D.N.Y.1987); and *In re Turner,* 69 B.R. 995, 996 (Bankr.S.D.Ohio 1987).

The Plaintiff here maintains that the Statement was materially false in that it

1. Omitted the First Peoples Bank and Continental Bank mortgages on the Debtors' home and farm;

2. Listed the Debtors' horses as valued at $450,000.00 when they were not listed on their bankruptcy schedules;

3. Listed the values of certain other personal property, including equipment, cash, and autos, which were either not listed or were listed at much lower amounts on the Debtors' Schedules;

4. Overstated Martz's annual salary or income;

5. Failed to list contingent liabilities, specifically two loans guaranteed with IVB Bank, one with R.K. Leasing, and one with Betsy Ross Plaza; and

6. Failed to list Raymond Martz's liability for taxes of UDC.

There can be no dispute that the 1985 Statement was a written publication regarding the Debtors' financial condition, as required by 11 U.S.C. § 523(a)(2)(B)(ii). The Debtors argue that they did not "cause" the Statement "to be made or published" within the meaning of § 523(a)(2)(B)(iv), since the Statement was prepared by some person other than the Debtors. However, it is generally recognized that a writing is "published" under § 523(a)(2)(B)(iv) if it is either written by the debtor, signed by the debtor, *or* adopted and used by the debtor. *In re Howard*, 73 B.R. 694, 702 (Bankr.N.D.Ind. 1987); 3 COLLIER ON BANKRUPTCY, ¶ 523.09[1], at 523–52 to 523–53 (15th ed. 1987); and Comment, *Section 523(a)(2)(B): Exceptions to Discharge For Fraudulently Obtained Loans*, 5 BANKR.DEV.J. 151, 157 (1987). *See Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir.1984); *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983); *In re Gonzalez*, 287 F.Supp. 281 (S.D.N.Y.1968); *In re Aldrich*, 16 B.R. 825 (Bankr.W.D.Ky. 1982); *In re Granovetter*, 29 B.R. 631 (Bankr.E.D.N.Y.1983); and *In re Baiata*, 12 B.R. 813 (Bankr.E.D.N.Y.1981).

Martz did not physically complete the Statement. In fact, so many figures are directly transposed from the December 31, 1983, Statement provided by Martz that it is unclear whether the Statement was prepared based on information provided by Martz or information obtained in the 1983 financial statement. However, Martz concedes that he signed the Statement and that 1st Financial was authorized to fill out forms and apply for funding at his request and on his behalf. Martz should not be permitted to disclaim a financial statement prepared at his request on a form to which he affixed his signature simply because he failed to review the Statement.

However, the Plaintiff bears the burden of proving several other prerequisites, most notably, initially, that the 1985 financial statement was "materially false." § 523(a)(2)(B)(i). This requires a showing not only that the financial statement was in fact false, but also that the falsehood was material to the creditor's decision to enter into the transaction, i.e., but for the false statement, the financial institution would not have made the loan in question. *Bogstad, supra*, 779 F.2d at 375; and *In re Roland*, 65 B.R. 1003, 1006 (Bankr.D.Conn. 1986).

Addressing items 2 and 3 of the list of purportedly materially false statements of the Debtors recited at page 670 *supra*, the Plaintiff has failed to prove that the values assigned to the Debtors' horses or to their other personal property were in fact accurate. Martz testified that he thought the values assigned to these assets was accurate at the time that the Statement was made.

With respect to the value of the Debtors' horses, McMahon indicated that the Plaintiff had initially questioned this amount. However, without any independent verification of amount, the Plaintiff determined that the Debtors' horses could well be worth the $450,000.00 figure given on the basis of Rudolph's statements. *Cf. In re Picou*, 81 B.R. 152, 155 (Bankr.S.D.Fla. 1988) (bank's reliance on valuation of stock was unreasonable where the only verification was the word of another bank customer with no known expertise in such valuation). On the basis of this record, it cannot be said that the Plaintiff has proved by clear and convincing evidence that the value of the Debtors' horses given in the Statement was "materially false."

According to McMahon's testimony, it appears that the Plaintiff believed $39,-000.00 to be an accurate assessment of the value of equipment used in the operation of a horse farm. The Plaintiff did not, at the time, question the value assigned to the Debtor's personal property. The Plaintiff has failed to provide any evidence that the value of these assets was other than the

amounts reflected in the 1985 financial statement.

The Plaintiff argues that material falsity should be inferred in light of the discrepancies in values found in the 1985 financial statement and the schedules filed in connection with the Debtors' bankruptcy petition, which list all of the Debtors' personal property as valued at but $5,950.00. In support of this argument Plaintiff cites *Regency Nat'l Bank v. Blatz*, 67 B.R. 88 (E.D.Wisc.1986). In *Regency*, the debtor had submitted a financial statement reflecting a *positive* net worth in the amount of $1,448,750.00. Three months after this statement was submitted, the debtors' filed bankruptcy schedules reflecting a *negative* net worth in the amount of $2,469,706.00. The court there concluded that the nearly $4 million discrepancy within three months gave rise to an inference that the financial statement was materially false.

We find the facts in *Regency* to be inapposite to those of the present case. The Debtors here filed their bankruptcy petition on November 25, 1986, fourteen (14) months after the 1985 financial statement was submitted. The Debtors began incurring substantial additional liabilities only after Martz became sole shareholder of UDC in October, 1985. Once UDC started experiencing financial difficulties, many of the Debtors' contingent liabilities for business debts became manifested as absolute liabilities. In addition, it appeared from Martz's testimony that personal assets were sold during this period to meet the growing financial demands of UDC. Given this factual scenario, we will decline to infer material falsity from discrepancies between the financial statement and the bankruptcy schedules.

■ It appears that the financial statement did overstate Martz's annual salary. However, the Plaintiff presented no evidence tending to establish that Martz's erroneous representation of his salary was material to its decision to enter into the transactions. Prior to the second transaction, Martz's accountant apparently accurately estimated his 1985 income was approximately $100,000.00 rather than $225,-000.00. Nevertheless, the Plaintiff did not hesitate in finalizing the second transaction after obtaining this information. This leaves in issue only the failure of the statement to recite the additional mortgages against their realty and the failure to recite Martz's contingent liabilities.

■ At the outset, we note that the Plaintiff has also failed to prove that the Statement was materially false due to its failure to list the obligation with Betsy Ross Plaza and Halloran, since, as it has been stipulated by the parties, these obligations were not incurred until the transaction by which Martz purchased UDC from Halloran took place in October, 1985.

The Debtors concede that the 1985 financial statement is false in that it fails to include the mortgages in favor of First Peoples Bank and Continental Bank that were in existence in September, 1985. The Debtors also concede that the financial statement was erroneous in that it failed to list certain contingent liabilities, including two business loans with IVB and a debt with R.K. Leasing.

With respect to the income taxes, Martz testified that he had been advised by his attorney that, as President of UDC, he was personally liable for back taxes due to the IRS. While Martz stated that Halloran paid all or most of the outstanding taxes prior to September, 1985, from the proceeds from the sale of two of UDC's hotels, the IRS later assessed interest and penalties. Martz testified that, as of September, 1985, there was a balance due to the IRS of approximately $160,000.00.

Thus, the Plaintiff has shown that the 1985 financial statement was false in that it failed to include mortgages on the Debtors' real property and failed to include certain contingent liabilities including Martz's liability for outstanding UDC taxes. However, it is not clear that these omissions from the financial statement were material to the Plaintiff's decision to enter into the lease agreement. The requirement that the false statement be "material" is closely related to the requirement that the creditor "reasonably rely" on the false statement.

In order to prevail under § 523(a)(2)(B), a creditor must prove by clear and convincing evidence that it reasonably relied on the misstatement. § 523(a)(2)(B)(iii). *Lippert, supra,* 84 B.R. at 617–18; *Picou, supra,* 81 B.R. at 154–55; and *In re Delano,* 50 B.R. 613, 617–19 (Bankr.D.Mass. 1985). There are, in turn, two components to this requirement. The creditor must both show that it actually relied upon the misstatement and that such reliance was reasonable. We find that the creditor here has failed to establish either component as to the omitted mortgages or the omitted contingent liabilities.

The Plaintiff failed to establish actual reliance for a number of reasons. Foremost among them is the fact that the Statement was not received until *after* the lease agreement between the parties had been executed. The parties have stipulated that the first lease between them was executed on September 4, 1985. McMahon testified that the transaction was provisionally approved on August 30, 1985. However, the Plaintiff did not receive the Statement until September 6, 1985. It therefore appears that this document played, at most, a minor role in the Plaintiff's approval of the transaction. *Compare In re Sawyer,* 76 B.R. 201, 203 (Bankr.M.D.Fla.1987) (no reasonable reliance where loan approved before debtors had arrived at creditor's office to provide statement of obligations).

Secondly, the Plaintiff's evidence regarding any measure of reliance was equivocal at best. McMahon testified only that the Plaintiff might not have approved the proposed lease agreement "as easily" if the Debtors' financial statements had not been so strong, *not* that the lease application would have been denied had it not been so strng. Indeed, the Plaintiff's own conduct belies its claim of reliance.

Finally, it appears from the evidence that the Plaintiff's actions were primarily motivated by considerations other than the Statement. After review of the initial documents submitted in connection with the original lease application, the Plaintiff contacted the business references as well as creditors listed on the 1983 financial state-

ment. The Plaintiff determined, from consideration of this information, that Martz had substantial experience in the hotel and restaurant industry and that his credit history was excellent. It appears that these factors, rather than the figures recited on the Statement, motivated the Plaintiff's decision to approve the first lease application. *See Figueredo, supra,* 84 B.R. at 858 (no reliance on financial statements found where the evidence indicated that the creditor relief exclusively on the personal guarantee of a majority stockholder); *Lippert, supra,* 84 B.R. at 617 (creditor failed to show reasonable reliance on a financial statement rather than on the debtor's cash flow and its own security interests in machinery and equipment); *Duncan, supra,* 81 B.R. 665, 668 (no reasonable reliance by creditor found on purported ownership of realty where there was no verification of ownership and the application suggests reliance was not based on such ownership). This is particularly true with respect to the second lease agreement, since McMahon's and Martz's testimony indicates that the only real requirement imposed for approval of the second lease application was that Cafe Raymon be current on its payments under the first lease, which it was. *See In re Savich,* 82 B.R. 1011, 1012–13 (Bankr.W. D.Mo.1988) (bank not found to have relied on false statement when it renewed the loan after it received a correct statement).

Even if the Plaintiff had established reliance, it would have had to show that such reliance was reasonable. *Lippert, supra,* 84 B.R. at 617. The reasonableness of a creditor's reliance is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in an average business transaction under similar circumstances. *In re Icsman,* 64 B.R. 58, 62 (Bankr.N.D.Ohio 1986). *Cf. Bossard, supra,* 74 B.R. at 736. A determination of reasonable reliance requires consideration of the creditor's standard practices in evaluating credit worthiness, the standards or customs of the creditor's industry in evaluating credit worthiness, and the surrounding circumstances existing at the time of the debtor's application for credit. *In re*

*Mitchell,* 70 B.R. 524, 528 (Bankr.N.D.Ill. 1987). Reliance has been found to be unreasonable when

1. The creditor knows that the financial statement is not accurate;
2. the financial statement does not contain adequate information to present an accurate picture of the debtor's financial condition for credit analysis;
3. the creditor's own investigation suggests that the financial statement was false or incomplete; or
4. the creditor fails to verify information on the statement.

*Bonnett, supra,* 73 B.R. at 719; and *Picou, supra,* 81 B.R. at 154–55. Thus, a creditor may not assume the position of an ostrich and bury its "commercial head in the sand." *Bonnett, supra,* 73 B.R. at 719; and *Bossard, supra,* 74 B.R. at 735. In order to establish reasonable reliance in a transaction between parties which have had no previous ongoing business relationship and there is information on the statement that would have lead a reasonable person to believe the statement is ambiguous or suspect, a creditor should independently verify the information contained therein. *See Bogstad, supra,* 779 F.2d at 372–73; *Lippert, supra,* 84 B.R. at 617; *Bossard, supra,* 74 B.R. at 735; and *Picou, supra,* 81 B.R. at 155.

In the present case, the parties had no prior business dealings. The Plaintiff's witnesses indicated that they had not previously leased restaurant equipment, but that they were aware that such equipment depreciated quickly. In light of these circumstances, a reasonably prudent business person would have questioned and sought to verify information on the Statement.

The Plaintiff made no effort to verify the liens against the Debtors' realty, which it could have easily and accurately done by performing lien searches on their property. *Compare Duncan, supra,* 81 B.R. at 668 (no reasonable reliance found because creditor did not verify ownership of realty by the debtors). The Plaintiff's failure to do so supports the conclusion that this was not an important element in the transaction. *Compare id.*

It is also significant that all significant contacts and communications between the parties were through an intermediary, 1st Financial. It would seem prudent for a lender to make *some* personal contact with a borrower to avoid errors of transmission by the intermediary, as apparently occurred here. Again, such prudence would be anticipated if the contents of the Statement were really important to resolution of the transaction. The absence of such checks and balances suggests that the Statement's contents were, in actuality, relatively insignificant.

In addition, the Plaintiff had a duty to seek additional verification due to the "red flags" raised by the Statement. The entire transaction was a "red flag": why would a millionaire with $35,000.00 in ready cash enter into a high-interest loan which included giving title to his restaurant's equipment to a lender? Obviously, the Debtors must have been in difficult financial straits to consider such a transaction. Martz also testified that he was anxious about receiving the proceeds from the transaction, causing him to call the Plaintiff's office to attempt to speed it along. Thus, the *only* personal contact between the parties should have raised an additional "red flag." However, the Plaintiff nevertheless persisted in its failure to verify any questionable aspects of the statement firsthand from the Debtors.

In addition, the Plaintiff had certain information available to it that suggested that the information contained on the Statement was incomplete or inaccurate, and that such information should have been checked if its accuracy had in fact been important to the transaction. The Plaintiff complains that the Debtors failed to disclose their contingent personal liability on their business debts, specifically those with IVB and R.K. Leasing. However, debts with IVB and two short-term debts with BA Business were listed on the 1983 financial statement as well as long-term notes. Both R.K. Leasing and IVB were listed and contacted as business references for Martz. Both advised the Plaintiff that they had current accounts with Martz, albeit that

were being paid in a timely fashion. In addition, the credit search on Martz revealed an existing account with IVB. In light of this information, the Plaintiff clearly should have inquired as to the Debtors' liabilities on these undisclosed debts if their presence really was significant. The Plaintiff should not be allowed to claim ignorance of debts of which it was informed in checking credit references.

In addition, a UCC search had been ordered prior to both leases. The second UCC search, ordered in the name of Martz, yielded five effective UCC filings, with other parties not identified in the financial statement. Despite this information, the Plaintiff made no further inquiry regarding Debtors' personal liability to these creditors before approving the second Lease.

There were other circumstances which should have prompted further inqury. The credit search on Martz indicated numerous inquiries from potential creditors, including Continental Bank, which held mortgages on the Debtors' farm and home. This further supported the conclusion that the Debtors were suspiciously desperate for cash, which should have prompted further investigation.

A comparison of the 1983 and 1985 financial statements indicates that the exact same value was assigned to the Debtors' deposits, equipment, and personal property. Moreover, the valuations of cash and real estate mortgages was strikingly similar. Particularly in light of the fact that this Statement was produced within a week of when it was requested, these circumstances should have suggested that the Statement was prepared quickly and most probably interpolated from the 1983 Statement with little care, irrespective of who had been its author. However, the Plaintiff accepted it without apparent question, much less investigation.

Finally, McMahon testified that the Plaintiff's normal procedure in considering a lease application included obtaining a Dun & Bradstreet or similar report on the business. In the present case, no such report was obtained for Cafe Raymon, despite the series of "red flags" which developed, before entering into either transaction. *Compare Mitchell, supra,* 70 B.R. at 529 (not unfair to hold creditor to its own ordinary practices and failure to follow ordinary practices negates reasonable reliance).

This series of circumstances and failures to further investigate same by the Plaintiff supports the conclusion that, in fact, the Plaintiff was not relying on the 1985 financial statement at all. The Plaintiff has therefore failed to sustain its burden of proving, by clear and convincing evidence, that it reasonably relied on the Statement in entering into either of the lease transactions. Concomitantly, the Plaintiff has failed to establish that the misstatements in the Statement were "material" in its decision to approve the lease applications.

In light of our findings against the Plaintiff on the issue of whether it met the requirements of § 523(a)(2)(B)(iii), we need not decide whether the Debtors made material misstatements with "intent to deceive" or address the issue of the liability of Kazuko for such misstatements made, if at all, exclusively by her husband. However, we shall address each of those issues briefly. First, although we have some skepticism about Martz's contentions that he was unaware of the First Peoples Bank and Continental Bank mortgages against his premises, we have no hesitancy in believing that he was, as he testified, unaware of the scope of the contingent liabilities at this juncture. The mortgages were, of course, eminently more discoverable by the Plaintiff through lien searches than were the existence of the contingent liabilities, and hence the weakness of the Plaintiff's satisfaction of the element of § 523(a)(2)(B)(iii) is greater in reference to the realty than it is as to the contingent liabilities. However, the Plaintiff's satisfaction of the element of § 523(a)(2)(B)(iv) is weaker as to the contingent liabilities. Failures of consumers to recognize the existence of contingent liabilities have frequently been deemed justified when, as here, the debtor's testimony of lack of awareness of the existence of the liability is credible. *Compare Bossard, su-*

*pra,* 74 B.R. at 732–33; and *Turner, supra,* 69 B.R. at 997.

■ Finally, we doubt that liability under § 523(a)(2)(B) can be imputed to Kazuko, due to the express requirement that a debtor have an "intent to deceive" in order for a creditor to meet the prerequisites of § 523(a)(2)(B)(iv).

The Plaintiff relies heavily upon Judge Fox's decision denying a wife's claim that fraud could not possibly be imputed to her as a result of the actions of her husband in *In re Paolino,* 75 B.R. 641, 645–50 (Bankr. E.D.Pa.1987). However, that decision merely denied summary judgment to the wife, thus concluding that imputing of fraud to the wife could not be ruled out there as a matter of law. It should also be noted that the claims of the particular wife there that her husband was not her agent had been rejected in another context. *See In re Paolino,* 72 B.R. 323, 328–29 (Bankr. E.D.Pa.1987), *aff'd,* 75 B.R. 553 (E.D.Pa. 1987).

It is clear to us that Kazuko Martz had no knowledge or even remote involvement in the publication of her husband's financial statements, and hence it is questionable whether "intent to deceive" could be imputed to her here. We doubt that the mere facts, without more, that she is married to Martz and delegated all of the Debtors' financial dealings to him could support a decision against her, even if we found an "intent to deceive" on the part of Martz. Such a finding would run counter to the principle that exceptions to discharge are to be construed strictly against an objector and liberally in favor of debtors. *See In re Reed,* 700 F.2d 986, 993 (5th Cir.1983); *In re McCune,* 82 B.R. 510, 512–13 (Bankr.W. D.Mo.1987); *In re Shane,* 80 B.R. 240, 242–43 (Bankr.S.D.Fla.1987); and *In re Klein,* 58 B.R. 397, 398 (Bankr.E.D.Pa. 1986) (GOLDHABER, CH. J.). *Cf. In re Butler, Howkins v. Butler,* 86 B.R. 829, 832 (Bankr.E.D.Pa.1988) (constructive fraud does not support a claim of nondischargeability under § 523(a)(2)(A)).

These conclusions also support the result set forth in our following Order, rendering judgment in favor of the Debtors.

### ORDER

AND NOW, this 30th day of June, 1988, after a trial in the above adversarial proceeding on January 12, 1988, and upon consideration of the Stipulation of Facts and Proposed Findings of Fact and Conclusions of Law and Briefs submitted by the parties, it is hereby ORDERED as follows:

1. Judgment in this matter is entered in favor of the Debtors, RAYMOND D. AND KAZUKO MARTZ, and against the Plaintiff, LANDMARK LEASING INCORPORATED.

2. The obligations of the Debtors to the Plaintiff, as set forth in the Complaint, are determined to be DISCHARGEABLE in the present Chapter 7 bankruptcy case.