In re Maytor H. McKINLEY, Jr., Debtor.

**CONTINENTAL BANK, Plaintiff,**

v.

**Maytor H. McKINLEY, Jr., Defendant.**

**Bankruptcy No. 93–16260 DWS.**
**Adv. No. 94–0086.**

United States Bankruptcy Court,
E.D. Pennsylvania (Philadelphia).

Dec. 21, 1995.

Lee Ann M. Williams, Jr., Patterson & Weir, Philadelphia, Pennsylvania, for Continental Bank.

Marc S. Zamsky, Astor Weiss Kaplan & Rosenblum, Philadelphia, Pennsylvania, for debtor.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the Court in this core proceeding is Count II of the complaint of Continental Bank requesting a finding that the debt of Maytor H. McKinley (Debtor) to Continental Bank is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). At the close of Continental Bank's case, Debtor's Motion for Directed Verdict on Count I of the complaint, which stated a cause of action under § 523(a)(2)(A), was granted and Count I was dismissed with prejudice.

In Count II Continental Bank maintains that the debt is nondischargeable on the basis of § 523(a)(2)(B). In order to prove nondischargeability on this ground the Bank must establish that Debtor obtained the refinancing by a materially false written statement regarding his financial condition on which the Bank reasonably relied.[1] The Bank also must show that Debtor intended to deceive the Bank in submitting the materially false written statement. 11 U.S.C. § 523(a)(2)(B). We find that the Bank has not proved all elements of nondischargeability to a preponderance under this section and,

therefore, the debt is dischargeable. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## FACTS

Based on a referral from someone associated with a development corporation, Debtor contacted Continental Bank in the fall of 1990 in an effort to obtain a loan of $550,000 for the development of a business, the Chesapeake Gun Club. The loan was to be secured by Club assets. Although Debtor believed that the loan would be approved, it became evident some time after the holidays in 1991 that the Bank would not provide the commercial financing because it was leaving the commercial lending business.

At the suggestion of William Fagan, vice president of Continental Bank, Debtor agreed to take a personal unsecured loan of $250,000 as a bridge loan for six months until he could obtain other financing for the Club. Until this time the Bank had not inquired into Debtor's personal finances but, in connection with the personal loan, the Bank requested information about his current financial status. Debtor provided an unsigned document referred to by the trial witnesses as a financial statement. However, the caption of the signed version of the document entered into evidence as Plaintiff's Exhibit 11 and dated "12/31/90" is "Maytor H. McKinley—Balance Sheet". The unsigned copy no longer exists in the Bank's file. Nonetheless, the fact that William Fagan saw the unsigned document is established by Fagan's affidavit which incorporates Plaintiff's Exhibit 20.

Plaintiff's Exhibit 20 is a memorandum from Fagan to the Bank's credit acquisition department concerning the agreement to lend Debtor $250,000. It refers to various items on Plaintiff's Exhibit 11, the signed version of the 1990 financial statement. These items include a $5.4 million interest in various businesses, $500,000 in cash or securities, a $5.7 million interest in real estate, a $3 million trust (the "100% trust") and an

---

**1.** On November 28, 1995, the United States Supreme Court decided *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), and held that under 11 U.S.C. § 523(a)(2)(A) the standard is one of justifiable reliance. Because Count I alleging nondischargeability under § 523(a)(2)(A) was dismissed, we do not reach this issue.

$815,000 trust (the "Hawaiian Guardian trust") as well as other assets. The net worth reflected on Exhibit 11 is $16.4 million. In his affidavit, which was filed in connection with the trial of this matter, Fagan stated that, prior to approval of the loan on January 9, 1991, he had seen and relied on an unsigned "personal financial statement" given to him by Debtor. *See* Affidavit of William W. Fagan ("Fagan Affidavit") at ¶ 10. The testimony established that the Bank had been shown an unsigned balance sheet before it made the loan. Based on the testimony, we find that the unsigned version is identical to the signed version in all material respects. The only differences are that Exhibit 11 has handwritten notes in the left margin and Debtor's signature at the end of the exhibit. Neither of these was on the missing unsigned version. The changes are not material to any issue before the court. *See* Plaintiff's Exhibit 11.

Fagan's internal bank memorandum, dated January 16, 1991, indicates that he granted the loan and authorized the first disbursement of $50,000 on January 16, 1991, based upon, *inter alia*, the assets listed on the unsigned, now missing, version of Plaintiff's Exhibit 11 and Debtor's minimal debt. Plaintiff's Exhibit 20. The loan was approved on January 9, 1991, and the first disbursement of $50,000 was made on January 16, 1991. The signed balance sheet, Exhibit 11, was not sent to the Bank until after the loan was approved and the first disbursement made. *See* Plaintiff's Exhibit 21 (letter of January 22, 1991, from Premier Sporting Clubs by Maytor H. McKinley, Chairman, to William W. Fagan transmitting Exhibit 11). The next advance of $50,000 was made on January 23, 1991. Both the January 16 and the January 23 disbursements are shown on Plaintiff's Exhibit 19, Commercial Loan Statement of Continental Bank. *See also* Plaintiff's Exhibits 17, 18.

It is not disputed that Debtor eventually received the entire $250,000. The parties agree that Debtor made "interest only" payments, as required by the loan documents, and that the Bank refinanced the loan on April 28, 1992, July 4, 1992, and November 30, 1992, without obtaining any updated financial information from Debtor, despite requests dated November 21, 1991, (Debtor's Exhibit 3), and April 10, 1992, (Debtor's Exhibit 5). The November 30, 1992, renewal was in the amount of $245,000 due to Debtor's payment of $5,000 toward principal. *See* Plaintiff's Exhibit 23, Memorandum of December 18, 1992, from Joseph G. Meterchick, Vice President of Continental Bank, to CAIC # 4 (credit department) ("Meterchick memorandum").

In his internal bank memorandum, Joseph G. Meterchick, Fagan's successor, indicated that, in connection with the renewal on November 30, 1992, he had requested an updated personal financial statement from Debtor as well as collateral for the Note. Plaintiff's Exhibit 23. He sent McKinley a blank form utilized by the Bank for this purpose. It was not until February 2, 1993, however, that Debtor provided any updated financial information, and it was not submitted on the Bank's form as Meterchick had requested. *See* Plaintiff's Exhibit 12 (balance sheet dated February 2, 1993, signed by Debtor). The 1993 balance sheet reflects Debtor's net worth as slightly in excess of $2.5 million, a diminution of $13.9 million from the 1990 balance sheet. Notwithstanding the magnitude of the loss in net worth between the 1990 and 1993 balance sheets, the Bank issued its final renewal on February 3, 1993, in the form of a non-discount note in the amount of $244,000 payable on demand. The reduced principal amount reflected another $1000 payment toward principal. The unpaid balance is $229,688.33. *See* Plaintiff's Exhibit 6. *See also* Affidavit of Joseph G. Meterchick ("Meterchick Affidavit") at ¶ 9.

## ISSUES

The disputed issues are (1) whether the statements of financial condition were materially false; (2) whether the Bank reasonably relied on materially false financial statements in extending and/or renewing credit to Debtor; and (3) whether Debtor intended to deceive the Bank. Section 523(a)(2)(B) of the Bankruptcy Code provides that a debt for an extension, renewal, or refinancing of credit is

nondischargeable to the extent that it is obtained by

use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . .

11 U.S.C. § 523(a)(2)(B). The Bank must prove all the elements of § 523(a)(2)(B) by preponderate evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). It is not disputed that the 1990 and 1993 balance sheets concerned Debtor's financial condition.

## DISCUSSION

### Introduction

■ The Bank argues that both the 1990 and the 1993 balance sheets are materially false in that they contain a value for two trusts (the "100% trust" and "Hawaiian Guardian Ltd.") in which Debtor held only a beneficial interest in proceeds on investments, but no right to the corpora. Debtor conceded at trial that the balance sheets included values in excess of his beneficial interests in both trusts, even though he knew when he prepared them that he did not then, and would never, own the principals. He testified that he included the information because he once was told by a bank to disclose the source of his trust income. The 1990 balance sheet specifically names the trusts. The 1993 balance sheet includes a "Trusts/ Sales Contracts" category but does not specify the trusts or any other items in the category.

### December 30, 1991, Balance Sheet Material Falsity and Reasonable Reliance

With respect to the 1990 balance sheet, we find that it was false in that it overstated or misstated Debtor's interest in the trusts. However, the falsity was not material in the circumstances of this case. In determining materiality under § 523(a)(2)(B)(i) we must consider whether the statement "is so sub-

stantial that a reasonable person would have relied upon it, even if the creditor did not *in fact* rely upon it". *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir.1995) (emphasis in original). In this case, the statement of Debtor's interest in the trusts was not material to a $250,000 loan inasmuch as excluding approximately $4 million from the value of the trusts would have reduced Debtor's net worth to approximately $12.6 million. The Bank presented no evidence to establish that it would not have given Debtor the $250,000 unsecured loan, that it solicited, based on a $12.6 million net worth, although it did, in fact, lend Debtor $250,000 unsecured on what it believed was a $16.4 million net worth.

■ Even if the discrepancy between $16.4 million and $12.6 million was "capable of influencing" the Bank's decision to lend $250,000, and, therefore, was a material falsity, the Bank has not established that it reasonably relied on the misstatement, as is its burden pursuant to § 523(a)(2)(B)(iii).

A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*In re Cohn*, 54 F.3d at 1117.

The testimony established that the Bank solicited and granted an unsecured loan of $250,000 without verifying any of the items listed on the now missing, unsigned December 31, 1990, balance sheet. *See* Fagan Affidavit. However, as is evident from the face

of Exhibit 11, the 1990 balance sheet was not prepared in accordance with any generally accepted accounting technique. The methods and sources of valuation of the particular assets listed are not identified anywhere on the balance sheet and there are no explanatory notes accompanying the document. The Bank did not attempt to identify the "marketable securities" mentioned in the 1990 balance sheet and never asked Debtor about his ownership interest in any of the stocks, real estate or trusts identified. The signed balance sheet could not have influenced the Bank's decision to make the loan because the Bank did not have the balance sheet until *after* it had approved the loan and made the first disbursement. The Bank neither required Debtor to verify the contents under penalty of perjury nor insisted that Debtor fill out its own readily available form for financial information, although it requested that Debtor do so several times. To the extent that the Bank's standard practice in determining the credit-worthiness of a borrower was to require use of its form, we find that it did not follow its normal business practice. The Bank did not exercise "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances". *In re Cohn*, 54 F.3d at 1117 (citations omitted). Because the balance sheet was not clear and does not contain sufficient indicia of reliability of the truthfulness of the content on its face, the Bank should have inquired into its contents. *Cf. In re Hall*, 109 B.R. 149, 154 (Bankr.W.D.Pa.1990) (creditor has no duty to conduct independent investigation when, on its face, all facts are sworn to as accurate). A cursory investigation would have revealed that Debtor incorrectly included the trusts' values as part of his net worth. *Cf. In re Martz*, 88 B.R. 663, 671 (Bankr.E.D.Pa.1988) (creditor has duty to make reasonable check on credit rating and not rely solely on financial statement).

The Bank proved that the stated value of the "100% trust" (more than three million dollars) and of the "Hawaiian Guardian Ltd." trust (more than $800,000) should not have been included on the balance sheet. However, deletion of those amounts merely reduced a net worth of over $16.4 million to a net worth of approximately $12.6 million. There was no evidence that the Bank would not have lent the money to Debtor based on a net worth of $12.6 million. The Bank made no effort to introduce evidence of any policies it may have had to evaluate credit-worthiness, such as its loan to equity ratios, that may have shown that a net worth of $16.4 million was sufficient for this loan but a net worth of $12.6 million was not. Moreover, the Bank was aware that Debtor's taxable income in 1988 was "in excess of $228,000 and is expected to be similar in 1989 and 1990." Plaintiff's Exhibit 20, Memorandum of January 16, 1991, from William W. Fagan, Vice President # 15 of Continental Bank, to Credit Acquisition Department # 14) ("Fagan Memorandum"). From this income and Debtor's minor debts at the time, ability to repay the loan as it was structured (i.e., interest-only payments until Debtor obtained a commercial loan)[2] was established. The court credits Debtor's evidence that the Bank relied on Debtor's income.

The evidence adduced at trial by the Bank established that it made the loan because it wanted to obtain new business from Debtor and his companies. *See* Plaintiff's Exhibit 20. In his memorandum to Continental Bank's credit acquisition department, Fagan wrote that Debtor

is the principal owner of a group of companies ... [which] includes over 50 companies located in seven (7) states.... The main company in the Philadelphia area is Oliver H. Bair Funeral Home. This name and this company is [sic] well known in the Philadelphia area for over 50 years.... [Debtor] represents a significant depositor and we expect over time to be able to attract more deposits, not only of a personal nature but of the related companies that he owns.

2. The Note stated that Debtor would pay $250,000 "On Demand—after date, ... with interest thereon, payable monthly unless otherwise indicated hereon, at the rate of P + O percent per annum or such other rate of interest as Bank may from time to time determine." Plaintiff's Exhibit 1. The terms "On Demand" and "P + O" were typed into the form Note.

Plaintiff's Exhibit 20. In this case, Fagan's affidavit that he relied on a net worth of $16.4 million is the only evidence of the Bank's reliance. We do not credit this self-serving statement because of the other circumstances detailed herein. However, even if the Bank relied on it, we find the reliance unreasonable. The Bank knew Debtor's 1988 taxable income and projected his future income. The Bank also recognized his interests in various companies and relied upon his reputation and name recognition. The Bank made the first extension of credit without having received the signed balance sheet and never availed itself of numerous opportunities to insist upon updated, verified statements of Debtor's financial condition. Merely asking Debtor to explain the contents of the balance sheet would have revealed the inclusion of the trusts' corpora in the valuation. The Bank simply never asked. It was motivated by factors other than the balance sheet—to-wit, the possibility of future business from Debtor. We also find that the $250,000 unsecured loan was made *at the Bank's suggestion*, pending financing from another source for the Chesapeake Gun Club project. The suggestion was made before Debtor submitted *any* personal financial information to the Bank. We find that the fair inference from the evidence is that the Bank would have made the loan even if the trust values had been excluded from the 1990 balance sheet. That is, based on the testimony and evidence adduced at trial, we find that the Bank would have made the loan based on a net worth of over $12 million, Debtor's annual taxable income, Debtor's reputation, and the prospect of additional business from him and his companies.

With respect to each of the three refinances from 1990 through 1992, the Bank offered no evidence of any efforts to ascertain that the 1990 information, as reflected on Exhibit 11, was correct at the time it made each refinance. In his affidavit, Meterchick, who replaced Fagan in January of

1992, stated that he relied on the 1990 balance sheet in renewing the extension of credit to Debtor through 1992. However, despite the Bank's repeated requests to Debtor to use its form and update his financial information[3], Debtor never complied. Nonetheless, the Bank continued to renew the loan. Furthermore, the Bank presented no evidence concerning whether the extensions of the loan on stale information accorded with the Bank's regular practice or with banking industry standards. It offered no evidence concerning what, if any, policies and procedures it had in place to extend or refinance loans under these circumstances. Reliance on stale information in this case was not reasonable.

*Balance Sheet of February 2, 1993 Material Falsity and Reasonable Reliance*

The balance sheet signed by Debtor and dated February 2, 1993, reflected an interest in "Trusts/Sales Contracts" of $685,000. *See* Plaintiff's Exhibit 12. In his affidavit, Meterchick stated that he relied on the February 2 balance sheet for the final extension of the loan on February 3, 1993. Although in his affidavit Meterchick stated that he extended credit on February 3, 1993, based on the February 2, 1993, "personal financial statement" that listed Debtor's net worth as in excess of $2.5 million, no evidence was adduced to prove that the 1993 balance sheet was false. *See* Meterchick Affidavit at ¶¶ 7, 8. Thus, even if the Bank relied upon this information, it failed to prove the element of material falsity. Assuming, *arguendo*, that the statement contained some unidentified material falsehood, the Bank also failed to prove reasonable reliance.

At trial, Debtor testified that the category "Trusts/Sales Contracts" contained an undisclosed value for the trusts. The 1990 balance sheet showed that the trust corpora were valued in excess of $4 million. *See* Exhibit 11. The reduction in value of over $3 million

---

**3.** Debtor's Exhibit 3 is a letter dated November 21, 1991, requesting Debtor to use the Bank's form (Debtor's Exhibit 4) and submit a copy of his 1990 federal tax return. Debtor's Exhibit 5 is a letter from the Bank to Debtor dated April 10, 1992, requesting that the updated personal financial statement be submitted on the Bank's form.

Debtor did not comply. The Bank renewed the credit on April 28, 1992, July 4, 1992, and November 30, 1992, based on the 1990 balance sheet. Meterchick Affidavit at ¶ 4. This was done without insisting that Debtor comply with its requests for financial information in the proper format.

in the trusts was not explained on the 1993 balance sheet and the Bank did not require an explanation before the loan was made. The Bank failed to elicit any information from Debtor concerning this and, at trial, did not explain why it never questioned the decrease in the trust values or the $13.9 million reduction in net worth. At trial Debtor said, and we find, that no one ever asked him regarding the decrease in his net worth but, if asked, he would have said it was because real estate values decreased as did the value of the stock in the Oliver H. Bair Funeral Home. No evidence was introduced regarding the Bank's or the banking industry's practices or customs under similar circumstances. Moreover, no evidence was introduced to show that the Bank would not have extended its prior loan to Debtor on February 3, 1993, based on a net worth of $2.5 million. In this regard we note that, by letter of December 18, 1992, before the loan was renewed on February 3, 1993, the Bank requested Debtor to provide updated financial information, on the Bank's form. The Bank asked for the information before December 30, 1992, when the principal amount of the loan became due, but yet again failed to insist on timely receipt or use of its form.

As in 1990, instead of complying with the Bank's request to use its form, Debtor substituted his own creation which is the 1993 balance sheet, Plaintiff's Exhibit 12. This document is even less specific, clear or regular on its face than Exhibit 11. It does not identify assets with any particularity. It merely lists broad categories, such as "current assets worth $95,115", "fixed assets worth $1,203,750", "real estate (estimated fair market value net of mortgages) worth $731,904" for a total in excess of $2.5 million. Nonetheless, the Bank renewed the loan without insisting on Debtor's compliance with their requests, without questioning the $13.9 million reduction in Debtor's net worth between 1990 and 1993, and without investigating the reduction in the stated trust values from more than $4 million in 1990 to $685,000 in 1993. We find, therefore, that the Bank had a duty to inquire into the contents of, or otherwise investigate, this document. It failed to do so. The Bank did not reasonably rely on the 1993 balance sheet in renewing the loan on February 3, 1993.

### Intent to Deceive—1990 and 1993 Balance Sheets

 The Bank argues that the inclusion of the false valuations for the trusts was either an intentional effort to deceive it or in such reckless disregard of the truth that we should find an intent to deceive. Intent to deceive "can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth". *In re Cohn*, 54 F.3d at 1119. We note first that Debtor denied an intention to deceive, and, from the facts of this case, we credit his testimony. This personal loan came about because the Bank offered it when it could not extend the commercial loan Debtor sought. Second, the first *signed* balance sheet was presented to the Bank in 1990 *after* the first advance was made to Debtor and on the day the Bank made the second advance. No updated information was given for the first three refinances. The second signed balance sheet was given to the Bank in 1993 one day before the last renewal of credit.

The evidence established that Debtor was an experienced businessman who had invested in real estate and real estate projects for many years. However, he was not skilled in the preparation and presentation of financial statements. Debtor testified that, in calculating the value of his real estate interests, he considered his percentage interest and the debt on the property and reported the net value of his interest. With respect to the trust values, he testified that he included the value of the corpora because, from past experience, he had been required to include that information in applying for credit. No testimony or evidence was introduced to contradict this testimony. Debtor testified that he prepared the December 30, 1990, balance sheet to give himself an idea of the worth of his own assets and liabilities. He used it as a "yardstick" to compare his fortunes to those in prior years. Although he was not careful to be accurate in the information presented, we find insufficient evidence to establish an intent to deceive or reckless disregard for the truth. The Bank offered the loan with-

out *any* representations from Debtor regarding his financial condition. It lent the money before it obtained a signed statement of financial condition.

There was no testimony elicited as to why Debtor did not disclose the details of his beneficial interest in the trusts.[4] We find, however, the error in the values of the trusts is not dispositive of the intent to deceive issue because the Bank lent him the money simply on the basis of an unsigned statement of financial worth, which statement was not even in the format required by the Bank. Debtor also testified, regarding the 1990 balance sheet, that, when Fagan asked him to fill out the Bank's form, Debtor asked Fagan if he could use his own form and Fagan agreed. This testimony was not contradicted. Even if Debtor harbored an intent to deceive in 1990, the Bank failed to prove that it reasonably relied on either financial statement. All elements of § 523(a)(2)(B) must be established by a preponderance of evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Regarding the 1993 balance sheet, there was no evidence that it was false and, therefore, no proof of any intent to deceive.

Based on the record and the fact that exceptions to dischargeability are to be construed strictly against the creditor and in favor of the debtor, we find that the debt to Continental Bank is dischargeable. *See In re Cohn,* 54 F.3d at 1113.

An appropriate order will be entered.

### ORDER

And now, to-wit, this 21st day of December, 1995, for the reasons set forth in the foregoing Memorandum Opinion, it is **ORDERED** that the debt owed by Debtor to Plaintiff Continental Bank in the amount of $229,688.33 is **DISCHARGEABLE.**

The Clerk shall close this Adversary.

---

4. Debtor testified that, on the 1990 balance sheet, Plaintiff's Exhibit 11, he included his annual income from the "100% trust" ($109,000) as well as the corpus. The 1990 balance sheet shows "current due from [100%] trust" as $109,- 000, and "current due from Hawaiian Guardian Ltd" as $55,000. However, Debtor included the trust corpora *and* the annual income in his calculation of net worth. *See* Plaintiff's Exhibit 11.